## HICKS *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 971. Submitted. November 16, 1893. — Decided November 27, 1893.

H. was indicted jointly with R. for the murder of C. Before the day of trial R. was killed, whereupon H. was tried separately. It was clearly proved at the trial that H. did not kill C. nor take any part in the physical struggle which resulted in his death at the hands of R. There was evidence tending to show that by his language and gestures H. abetted R., but this evidence was given by persons who stood at some distance from the scene of the crime. H. denied having used such language, or any language with an intent to participate in the murder, and insisted that what he had said had been said under the apprehension that R., who

was in a dangerous mood, was about to shoot him (H.). The court instructed the jury that it was proved beyond controversy that R. fired the gun, and continued: "If the defendant was actually or constructively present at that time, and in any way aided or abetted by word or by advising or encouraging the shooting of C. by R., we have a condition which under the law puts him present at the place of the crime; and if the facts show that he either aided or abetted or advised or encouraged R., he is made a participant in the crime as thoroughly and completely as though he had with his own hand fired the shot which took the life of the man killed The law further says that if he was actually present at that place at the time of the firing by R. and he was there for the purpose of either aiding, abetting, advising, or encouraging the shooting of C. by R., and that as a matter of fact he did not do it, but was present at the place for the purpose of aiding or abetting or advising or encouraging his shooting, but he did not do it because it was not necessary, it was done without his assistance, the law says there is a third condition where guilt is fastened to his act in that regard." *Held*, that this instruction was erroneous in two particulars :

(1) It omitted to instruct the jury that the acts or words of encouragement and abetting must have been used by the accused with the intention of encouraging and abetting R.;

(2) Because the evidence, so far as the court is permitted to notice it, as contained in the bills of exception, and set forth in the charge, shows no facts from which the jury could have properly found that the rencounter was the result of any previous conspiracy or arrangement.

Under the provisions in the act of March 16, 1878, 20 Stat. 30, c. 37, H. at the trial offered himself as a witness in his own behalf. In charging the jury the court said: "The defendant has gone upon the stand in this case and made his statement. You are to weigh its reasonableness, its probability, its consistency, and above all you consider it in the light of the other evidence, in the sight of the other facts. If he is contradicted by other reliable facts, that goes against him, goes against his evidence. You may explain it perhaps on the theory of an honest mistake or a case of forgetfulness, but if there is a conflict as to material facts between his statements and the statements of the other witnesses who are telling the truth, then you would have a contradiction that would weigh against the statements of the defendant as coming from such witnesses." *Held*, that this was error, as it tended to defeat the wise and humane provision of the law that "the person charged shall, at his own request, but not otherwise, be a *competent* witness."

The exception to the judge's charge does not embrace too large a portion of it, and is not subject to the often sustained objection, of not being sufficiently precise and pointed to call the attention of the judge to the particular error complained of.

THE case is stated in the opinion.

*Mr. A. H. Garland* for plaintiff in error.

*Mr. Assistant Attorney General Conrad* for defendants in error.

MR. JUSTICE SHIRAS delivered the opinion of the court.

In the Circuit Court of the United States for the Western District of Arkansas, John Hicks, an Indian, was jointly indicted with Stand Rowe, also an Indian, for the murder of Andrew J. Colvard, a white man, by shooting him with a gun on the 13th of February, 1892. Rowe was killed by the officers in the attempt to arrest him, and Hicks was tried separately and found guilty in March, 1893. We adopt the statement of the facts in the case made in the brief for the government as correct and as sufficient for our purposes:

"It appears that on the night of the 12th of February, 1892, there was a dance at the house of Jim Rowe, in the Cherokee Nation; that Jim Rowe was a brother to Stand Rowe, who was indicted jointly with the defendant; that a large number of men and women were in attendance; that the dance continued until near sunrise the morning of the 13th; that Stand Rowe and the defendant were engaged in what was called 'scouting,' viz., eluding the United States marshals who were in search of them with warrants for their arrest, and were armed for the purpose of resisting arrest; they appeared at the dance, each armed with a Winchester rifle; they were both Cherokee Indians. The deceased, Andrew J. Colvard, was a white man who had married a Cherokee woman; he had been engaged in the mercantile business in the Cherokee country until a few months before the homicide; he came to the dance on horseback on the evening of the 12th. A good deal of whiskey was drank during the night by the persons present, and Colvard appears to have been drunk at some time during the night. Colvard spoke Cherokee fluently, and appears to have been very friendly with Stand Rowe and the defendant Hicks.

"On the morning of the 13th, as the party were dispersing,

Colvard invited Stand Rowe and Hicks to go home with him, and repeated frequently this invitation. Finally, he offered as an inducement to Stand Rowe, if he would accompany him home, to give him a suit of clothes, and a hat and boots. The urgency of these invitations appears to have excited the suspicion of the plaintiff in error, who declared, openly, that if Colvard persisted in his effort to take Stand Rowe away with him he would shoot him.

"Some time after sunrise on the morning of the 13th, about 7 o'clock, S. J. Christian, Benjamin F. Christian, Wm. J. Murphy, and Robert Murphy, all of whom had been at the dance the night before and had seen there Colvard, Stand Rowe, and the defendant, were standing on the porch of the house of William J. Murphy, about 414 steps west from the house of Jim Rowe, and saw Stand Rowe, coming on horseback in a moderate walk, with his Winchester rifle lying down in front of him, down a 'trail,' which led into the main travelled road. Before Stand Rowe appeared in sight the men who were on the porch had heard a 'whoop' in the direction from which Stand Rowe came, and this 'whoop' was responded to by one from the main road in the direction of Jim Rowe's house. Stand Rowe halted within five or six feet of the main road, and the men on the porch saw Mr. Colvard and the defendant Hicks riding together down the main road from the direction of Jim Rowe's house.

" As Colvard and Hicks approached the point where Stand Rowe was sitting on his horse, Stand Rowe rode out into the road and halted. Colvard then rode up to him in a lope or canter, leaving Hicks, the defendant, some 30 or 40 feet in his rear. The point where the three men were together on their horses was about 100 yards from where the four witnesses stood on the porch. The conversation between the three men on horseback was not fully heard by the four men on the porch, and all that was heard was not understood, because part of it was carried on in the Cherokee tongue; but some part of this conversation was distinctly heard and clearly understood by these witnesses; they saw Stand Rowe twice raise his rifle and aim it at Colvard, and twice he lowered it; they

heard Colvard say, 'I am a friend to both of you;' they saw and heard the defendant Hicks laugh aloud when Rowe directed his rifle toward Colvard; they saw Hicks take off his hat and hit his horse on the neck or shoulder with it; they heard Hicks say to Colvard, 'Take off your hat and die like a man;' they saw Stand Rowe raise his rifle for the third time, point it at Colvard, fire it; they saw Colvard's horse wheel and run back in the direction of Jim Rowe's house, 115 or 116 steps; they saw Colvard fall from his horse; they went to where he was lying in the road and found him dead; they saw Stand Rowe and John Hicks ride off together after the shooting."

Hicks testified in his own behalf, denying that he had encouraged Rowe to shoot Colvard, and alleging that he had endeavored to persuade Rowe not to shoot.

At the trial the government's evidence clearly disclosed that John Hicks, the accused, did not, as charged in the indictment, shoot the deceased, nor take any part in the physical struggle. To secure a conviction it hence became necessary to claim that the evidence showed such participation in the felonious shooting of the deceased as to make the accused an accessory, or that he so acted in aiding and abetting Rowe as to make him guilty as a principal. The prosecution relied on evidence tending to show that Rowe and Hicks coöperated in inducing Colvard to leave the house, where they and a number of others had passed the night in a drunken dance, and to accompany them up the road to the spot where the shooting took place. Evidence was likewise given by two or three men, who, from a house about one hundred yards distant, were eyewitnesses of the occurrence, that the three men were seated on their horses a few feet apart; that Rowe twice raised his gun and aimed at Colvard; that Hicks was heard to laugh on both occasions; that Rowe thereupon withdrew his gun; that Hicks pulled off his hat, and, striking his horse with it, said to Colvard: " Pull off your hat and die like a man;" that thereupon Rowe raised his gun a third time and fired at Colvard, whose horse then ran some distance before Colvard fell. As the horse ran, Rowe fired a second time. When Colvard's

body was subsequently examined it was found that the first bullet had passed through his chest, inflicting a fatal wound, and that the second had not taken effect.

The language attributed to Hicks, and which he denied having used, cannot be said to have been entirely free from ambiguity. It was addressed not to Rowe, but to Colvard. Hicks testified that Rowe was in a dangerous mood, and that he did not know whether he would shoot Colvard or Hicks. The remark made — if made — accompanied with the gesture of taking off his own hat, may have been an utterance of desperation, occasioned by his belief that Rowe would shoot one or both of them. That Hicks and Rowe rode off together after seeing Colvard fall was used as a fact against Hicks, pointing to a conspiracy between them. Hicks testified that he did it in fear of his life; that Rowe had demanded that he should show him the road which he wished to travel. Hicks further testified, and in this he was not contradicted, that he separated from Rowe a few minutes afterwards, on the first opportunity, and that he never afterwards had any intercourse with him, nor had he been in the company of Rowe for several weeks before the night of the fatal occurrence.

Two of the assignments of error are especially relied on by the counsel of the accused. One arises out of that portion of the charge wherein the judge sought to instruct the jury as to the evidence relied on as showing that Hicks aided and abetted Rowe in the commission of the crime. The language of the learned judge was as follows:

"We are to proceed then to see whether the defendant was a party to the killing — that is, whether he was connected with it, or so aided or assisted in producing the act, as under the law he is responsible by the rules of the law for that act, as well as the man who fired the fatal shot if he were alive. We go to the first proposition where the crime of murder has been committed, which asserts that he who with his own hand did the act which produced the result is guilty. The second proposition is, that if at the time that Andrew J. Colvard was shot by Stand Rowe, the defendant was present at that time and at the place of shooting, that, of course,

would not alone make him guilty — the mere fact that he was present. Yet it is an element that we are to take into consideration to see whether his connection with the killing was such that he is guilty of the crime, because he could not be guilty unless present actually or constructively. Then we are to see whether he was present at the place of the killing. That does not mean that he had to be right at the man who was shot, right by the side of Stand Rowe, but that he was so near to that place as that he could in some way contribute to the result that was produced by some act done by him or by some words spoken by him. First, then, we inquire if he was present at the place of the shooting, and then while so present whether he aided, abetted, or advised, or encouraged the shooting of Andrew J. Colvard by Stand Rowe. Now, that is the second proposition I have asserted. Stand Rowe, as the proofs show beyond controversy, (and when the proof shows anything beyond controversy I may allude to it in that way,) is the man who fired the gun. If the defendant was actually or constructively present at that time, and in any way aided or abetted by word or by advising or encouraging the shooting of Colvard by Stand Rowe, we have a condition which under the law puts him present at the place of the crime; and if the facts show that he either aided or abetted or advised or encouraged Stand Rowe, he is made a participant in the crime as thoroughly and completely as though he had with his own hand fired the shot which took the life of the man killed. That is the second condition. The law further says that if he was actually present at that place at the time of the firing by Stand Rowe, and he was there for the purpose of either aiding, abetting, advising, or encouraging the shooting of Andrew J. Colvard by Stand Rowe, and that as a matter of fact he did not do it, but was present at the place for the purpose of aiding or abetting or advising or encouraging his shooting, but he did not do it because it was not necessary, it was done without his assistance, the law says there is a third condition where guilt is fastened to his act in that regard."

We agree with the counsel for the plaintiff in error in thinking that this instruction was erroneous in two particulars. It omitted to instruct the jury that the acts or words of encouragement and abetting must have been used by the accused with the intention of encouraging and abetting Rowe. So far as the instruction goes, the words may have been used for a different purpose, and yet have had the actual effect of inciting Rowe to commit the murderous act. Hicks, indeed, testified that the expressions used by him were intended to dissuade Rowe from shooting. But the jury were left to find Hicks guilty as a principal because the effect of his words may have had the result of encouraging Rowe to shoot, regardless of Hicks' intention. In another part of the charge the learned judge did make an observation as to the question of intention in the use of the words, saying: "If the deliberate and intentional use of words has the effect to encourage one man to kill another, he who uttered these words is presumed by the law to have intended that effect, and is responsible therefor." This statement is itself defective in confounding the intentional use of the words with the intention as respects the effect to be produced. Hicks no doubt *intended* to use the words he did use, but did he thereby *intend* that they were to be understood by Rowe as an encouragement to act? However this may be, we do not think this expression of the learned judge availed to cure the defect already noticed in his charge, that the mere use of certain words would suffice to warrant the jury in finding Hicks guilty, regardless of the intention with which they were used.

Another error is contained in that portion of the charge now under review, and that is the statement "that if Hicks was actually present at that place at the time of the firing by Stand Rowe, and he was there for the purpose of either aiding, abetting, advising, or encouraging the shooting of Andrew J. Colvard by Stand Rowe, and that, as a matter of fact, he did not do it, but was present for the purpose of aiding or abetting or advising or encouraging his shooting, but he did not do it because it was not necessary, it was done without his assistance,

the law says there is a third condition where guilt is fastened to his act in that regard."

We understand this language to mean that where an accomplice is present for the purpose of aiding and abetting in a murder, but refrains from so aiding and abetting because it turned out not to be necessary for the accomplishment of the common purpose, he is equally guilty as if he had actively participated by words or acts of encouragement. Thus understood, the statement might, in some instances, be a correct instruction. Thus, if there had been evidence sufficient to show that there had been a previous conspiracy between Rowe and Hicks to waylay and kill Colvard, Hicks, if present at the time of the killing, would be guilty, even if it was found unnecessary for him to act. But the error of such an instruction, in the present case, is in the fact that there was no evidence on which to base it. The evidence, so far as we are permitted to notice it, as contained in the bills of exception, and set forth in the charge, shows no facts from which the jury could have properly found that the rencounter was the result of any previous conspiracy or arrangement. The jury might well, therefore, have thought that they were following the court's instructions, in finding the accused guilty because he was present at the time and place of the murder, although he contributed neither by word or action to the crime, and although there was no substantial evidence of any conspiracy or prior arrangement between him and Rowe.

Another assignment seems to us to present a substantial error. This has to do with the instructions by the learned judge to the jury, on the weight which they should give to the testimony of the accused in his own behalf. Those instructions were in the following words:

" The defendant has gone upon the stand in this case and made his statement. You are to weigh its reasonableness, its probability, its consistency, and above all you consider it in the light of the other evidence, in the light of the other facts. If he is contradicted by other reliable facts, that goes against him, goes against his evidence. You may explain it perhaps on the theory of an honest mistake or a case of forgetfulness,

but if there is a conflict as to material facts between his statements and the statements of the other witnesses who are telling the truth, then you would have a contradiction that would weigh against the statements of the defendant as coming from such witnesses. You are to consider his interest in this case; you are to consider his consequent motive growing out of that interest in passing upon the truthfulness or falsity of his statement. He is in an attitude, of course, where any of us, if so situated, would have a large interest in the result of the case, the largest, perhaps, we could have under any circumstances in life, and such an interest, consequently, as might cause us to make statements to influence a jury in passing upon our case that would not be governed by the truth; we might be led away from the truth because of our desire. Therefore it is but right, and it is your duty to view the statements of such a witness in the light of his attitude and in the light of other evidence."

The learned judge therein suggests to the jury that there was or might be " a conflict as to material facts between the statements of the accused and the statements of the other witnesses who are telling the truth," and that " then you would have a contradiction that would weigh against the statements of the defendant as coming from such witnesses."

The obvious objection to this suggestion is in its assumption that the other witnesses, whose statements contradicted those of the accused, were " telling the truth."

The learned judge further, in this instruction, argued to the jury that, in considering the personal testimony of the accused, they should consider " his interest in this case." " You are to consider his consequent motive growing out of that interest in passing upon the truthfulness or falsity of his statement. He is in an attitude, of course, where any of us, if so situated, would have a large interest in the result of the case, the largest, perhaps, we could have under any circumstances in life, and such an interest consequently as might cause us to make statements to influence a jury in passing upon our case that would not be governed by the truth; we might be led away from the truth because of our desire. Therefore it is

but right, and it is but your duty to review the statements of such a witness in the light of his attitude, and in the light of the other evidence."

It is not easy to say what effect this instruction had upon the jury. If this were the only objectionable language contained in the charge, we might hesitate in saying that it amounted to reversible error. It is not unusual to warn juries that they should be careful in giving effect to the testimony of accomplices; and, perhaps, a judge cannot be considered as going out of his province in giving a similar caution as to the testimony of the accused person. Still it must be remembered that men may testify truthfully, although their lives hang in the balance, and that the law, in its wisdom, has provided that the accused shall have the right to testify in his own behalf. Such a privilege would be a vain one if the judge, to whose lightest word the jury, properly enough, give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability. The wise and humane provision of the law is that "the person charged shall, at his own request, but not otherwise, be a *competent* witness." The policy of this enactment should not be defeated by hostile comments of the trial judge, whose duty it is to give reasonable effect and force to the law.

These strictures cannot be regarded as inappropriate when the facts of the present case are considered. The only substantial evidence against the accused, on which the jury had a right to find him guilty, was that of witnesses who testified to words used by him at a distance of not less than one hundred yards. Apart from the language so attributed to him, there was no evidence that would have warranted a jury in condemning him. His denial of his use of the words and his explanation of his conduct should, we think, have been submitted to the jury as entitled to the most careful consideration. There was nothing intrinsically improbable in his statements; and it is not without significance that the inculpatory words were not testified to by the witnesses at the preliminary examination before the commissioner when the incident was fresh in their recollection.

It is urged in the brief filed for the government that the exception which is the subject of the first assignment of error should not be considered by this court because it embraces too large a portion of the judge's charge, and cases are cited in which this court has censured wholesale exceptions to a charge. It is justly said that the exception ought to be so precise and pointed as to call the attention of the judge to the particular error complained of, so as to afford him an opportunity to correct any inadvertence, in form or substance, into which he may have fallen. And it is further said that the revising court ought not to be compelled to search through long passages in an exception to reach errors that may be contained therein.

Conceding that such criticisms have often been justly made, we yet think that they do not apply to the exception under consideration. To enable us to form a just view of the error complained of, it was necessary, or at least useful, to cite the entire passage of the charge that covered it. To have selected certain obnoxious sentences as the subject of special exceptions might have justified the very opposite criticism, that the omitted context would have explained or nullified the error.

The learned judge below seems to have been satisfied with the shape in which the exceptions were presented to him, and we think they sufficiently raise the questions we have considered.

The judgment of the court below is

*Reversed and the cause remanded, with directions to set aside the verdict and award a new trial.*

MR. JUSTICE BREWER, with whom concurred MR. JUSTICE BROWN, dissenting.

I dissent from the opinion and judgment of the court in this case. It seems to me that the opinion proceeds in disregard of rules long ago established in regard to the conditions under which an appellate court will review the instructions given on the trial. Take the first matter referred to in the opinion. A page or so of the court's charge is excepted

to, and the exception is taken in this way: " To the giving of which charge to the jury the defendant at the time excepted." No particular sentence or proposition on this page is excepted to; no ground of objection is noted; the attention of the trial court is not directed to any matter, whether of statement or omission, which the defendant claims is objectionable, and so no opportunity given to correct the alleged mistake.

I understand the rule of law to be well settled that the attention of the trial court must be called to the specific matter which is claimed to be objectionable, and so called that an opportunity is given to make a correction. *Non constat*, but that if the attention of the court is thus called to the particular matter it will correct, and thus remedy any supposed error. Now, as stated, this whole page is objected to, and no grounds of objection given — no particular matter pointed out as erroneous. And yet there can be no doubt that much of what is said, and some, at least, of the propositions found in this portion of the charge, are unobjectionable. What is there wrong, for instance, in these declarations of law :

" We go to the first proposition where the crime of murder has been committed, which asserts that he who with his own hand did the act which produced the result is guilty. The second proposition is that if at the time that Andrew J. Colvard was shot by Stand Rowe the defendant was present at that time and at the place of the shooting, that, of course, would not alone make him guilty — the mere fact that he was present." " Yet it is an element that we are to take into consideration to see whether his connection with the act of killing was such that he is guilty of the crime, because he could not be guilty unless present actually or constructively." " Then we are to see whether he was present at the place of the killing. That does not mean that he had to be right at the man who was shot — right by the side of Stand Rowe — but that he was so near to that place as that he could in some way contribute to the result that was produced by some act done by him or some words spoken by him."

The decision of this court is that in the latter part of the charge on this page there was an omission of certain matter which was necessary to make the statement of the law full and accurate. What is the omission? Simply this, that when the court spoke of aiding or abetting " by word or by advising or encouraging," it did not add that " the acts or words of encouragement and abetting must have been used by the accused with the intention of encouraging and abetting." Can a party "advise" another to kill without intending to encourage the killing? Does not the word "abet" imply an intent that the party shall do that which he is abetted to do? Bouvier (vol. 1, p. 39) says: " To abet another to commit a murder is to command, procure, or counsel him to commit it." We are not dealing with the mock scenes and shows of the stage, but with real life, and in that who does not understand that the significance of the word " abet " is as Bouvier defines it, and carries with it the intent that the party shall do that which he is commanded, counselled, or encouraged to do? But whatever of technical criticism may be placed upon this language, can there be any doubt that twelve ordinary men, sitting as jurors, would understand that there was implied the intent on the part of the defendant to bring about the homicide by the use of the words? If the counsel for defendant thought there was any possibility of the jury being misled, or that any juror would understand the court as meaning to tell them that a party who, with no thought of murder, makes some casual remark, upon the hearing of which a third person is prompted to shoot and kill, was also guilty of murder from the mere fact of this accidental remark, all that would have been necessary would have been to call the attention of the court to the matter, and to avoid the possibility of misunderstanding a correction would unquestionably have been made. It seems to me that great injustice is being done to the government and wrong to the public when verdicts of guilty are set aside by reason of an omission from the charge, which probably did not mislead the jury, which would unquestionably have been corrected if called to the attention of the court, which was not specially excepted to, which affects but

one proposition among many, all of which were challenged by only a single exception running to them as an entirety, which was not noticed in the motion for a new trial or in the assignment of errors, and is evidently an afterthought of counsel, with the record before them studying up some ground for a reversal.

With regard to the second error, said by the court to exist in this page of the charge, it is found, as clearly appears from the opinion, only in the last sentence, and as an independent proposition. No separate exception was filed to that proposition. Could anything more clearly emphasize the fact that by this opinion the court is reversing the rule heretofore laid down as law in the quotations presently to be made, than thus picking out a single sentence containing an independent proposition, not especially excepted to, and declaring that a general exception to an entire page brings this error up for review. And that, too, when it is conceded that the objectionable words stated a proposition of law correctly applicable to some cases, though, as claimed, not to the facts of this. And here it is well to note the language of rule 4 of this court: "The judges of the Circuit and District Courts shall not allow any bill of exceptions which shall contain the charge of the court at large to the jury in trials at common law, upon any general exception to the whole of such charge. But the party excepting shall be required to state distinctly the several matters of law in such charge to which he excepts, and those matters of law, and those only, shall be inserted in the bill of exceptions, and allowed by the court."

What matter of law was distinctly stated in the bill of exceptions? I understand the court to concede that the rule is substantially as I have claimed, but hold that it is inapplicable here, and that in order to present a just view of the error complained of, it was necessary, or at least useful, to cite the entire passage of the charge that covered it. The law is good, but it ought not to be enforced. When, as here, the entire charge is preserved in the record it is not necessary to extend an exception to a whole page in order to see the bearing of the particular matter of alleged error. Even if the entire

charge was not preserved, and we had only this page before us, and the consideration of the entire charge was necessary to disclose the bearing of the particular sentence or proposition claimed to be erroneous — conceding all this, it. does not obviate the difficulty that the specific error now complained of was not called to the attention of the trial court. And, after all, the rule is as shown in the quotations following, that an objection must be made in such a way that the trial court knows what it is that is objected to, and has an opportunity to make a correction. . Nothing of that kind is possible when a party excepts to a whole page of the charge, and in the appellate court, for the first time, calls attention to the specific matter in a portion of that page which is said to be objectionable.

The suggestion that, because the learned judge below was satisfied with the shape in which the exceptions were presented to him, this court must consider them as sufficient for any matter which the ingenuity of counsel may, since the trial, have discovered, has certainly the merit of novelty. No one can say, from this record, that the questions which have been argued and upon which the reversal is ordered were ever suggested to the trial court at the time the instructions were given, or on the motion for a new trial, and they are not named in the assignments of error. And yet, because the trial judge did not direct that the exceptions be prepared in some other way, this court holds that they are sufficient to bring all the matters involved in this page of the charge before this court.

In the case of *Carver* v. *Jackson,* 4 Pet. 1, 81, the entire charge was placed in the record, with a general exception to each and every part thereof. This practice was strongly condemned, and in the opinion Mr. Justice Story uses this language, quoted approvingly by Chief Justice Marshall in *Ex parte Crane,* 5 Pet. 190, 198:

" If, indeed, in the summing up, the court should mistake the law, that would justly furnish a ground. for an exception. But the exception should be strictly confined to that misstatement, and, by being made known at the moment, would often enable the court to correct an erroneous expression, or to

explain or qualify it in such a manner as to make it wholly unexceptionable, or perfectly distinct."

In the case of the *First Unitarian Society* v. *Faulkner*, 91 U. S. 415, 423, this court said:

"Two or three passages of the charge, it must be admitted, are quite indefinite, and somewhat obscure; but they are not more so than the exceptions of the defendants, which are addressed to nearly a page of the remarks of the judge, without any attempt to specify any particular paragraph or passage as the subject of complaint; nor does the assignment of errors have much tendency to remove the ambiguity.

"Instructions given by the court to the jury are entitled to a reasonable interpretation; and they are not, as a general rule, to be regarded as the subject of error on account of omissions not pointed out by the excepting party."

In *Railroad Company* v. *Varnell*, 98 U. S. 479, 482, a similar matter was presented to the court and disposed of in these words:

"Three exceptions are embraced in the first assignment of error, and the complaint is that the court erred in failing to give the defendants the full benefit of their evidence as to the contributory negligence of the plaintiff.

"Turning to the record, it appears that the first exception to the charge of the court is addressed to nearly a page of the remarks of the presiding justice, with nothing to aid the inquirer in determining what the complaint is, beyond what may be derived from the exception, which is in the following words: 'To which instruction the counsel for the defendants then and there excepted.'

"Much less difficulty would arise if the assignment of error contained any designation of the precise matter of complaint; but nothing of the kind can be obtained from that source. Certain portions of those remarks appear to be unobjectionable; as, for example, the judge told the jury that they must first determine whether the plaintiff was a passenger on the railroad of the defendants, and he called their attention to the testimony of the conductor, that the plaintiff was not in the car in which it seems he claimed that he had been riding just before he received the injury."

In *Mobile & Montgomery Railway* v. *Jurey*, 111 U. S. 584, 596, the rule is thus stated:

"Conceding that the charge in respect to the rate of interest was erroneous, the judgment should not be reversed on account of the error. The charge contained at least two propositions, first, that the measure of damages was the value of the cotton in New Orleans, with interest from the time when the cotton should have been delivered ; second, that the rate of interest should be eight per cent. It is not disputed that the first proposition was correct. But the exception to the charge was general. It was, therefore, ineffectual. It should have pointed out to the court the precise part of the charge that was objected to. 'The rule is, that the matter of exception shall be so brought to the attention of the court, before the retirement of the jury to make up their verdict, as to enable the judge to correct any error if there be any in his instructions to them.'"

See also *Bogk* v. *Gassert*, 149 U. S. 17, 26.

And this, I understand, is the rule in all appellate courts. I think it should be strictly adhered to, and that this court should not notice an exception which runs to a page of the court's charge, which points out no sentence or clause which is objected to, and specifies no ground of objection.

Again, in that portion of the charge calling attention to the weight to be given to the testimony of the defendant, I think the court committed no error. The statute makes the defendant a competent witness. It affirms nothing as to his credibility. I understand the rule to be that a court is always at liberty to refer to any matters, interest, impeachment, contradiction, feeling, or otherwise, that bear upon the question of the credibility of any witness. When the defendant becomes a witness he subjects himself to the same liability to criticism. Stress is laid upon these words " *the* other witnesses who are telling the truth," and it is said that there is an assumption that the witnesses who contradict the defendant are telling the truth. If the first " the " had been omitted, and the language been " other witnesses," etc., no such implication would arise. Is not this a refinement of criticism which offends com-

mon sense? Does any one suppose.that the jury understood
the court to instruct them that the witnesses for the govern-
ment were telling the truth, and that the defendant was lying
when he testified differently? Is it not clear that they would
understand simply that their attention was called to the effect
on his credibility of a contradiction between his testimony and
that of disinterested witnesses? Has it come to this that the
use of the "definite article" in a charge is sufficient to set
aside a verdict and overthrow a trial? It is indisputable that
where the government calls an accomplice, it is the right, if
not the duty, of the court to call the attention of the jury to his
relationship to the case,.and the bearing which · such relation-
ship has upon .his credibility. If it may and ought to do that
to protect the defendant against the danger of perjury on the
part of witnesses of the government, may it not, and ought it
not to, do the same to protect the government against the, at
least equal, danger of perjury on the defendant's part? It is
the duty of the trial court to hold the scales even between
the government and the defendant, and, generally speaking,
what it may and ought to do on the one side it may and
ought to do on the other. For these reasons I dissent.

I am authorized to say that MR. JUSTICE BROWN concurs
with me in this dissent.