## RUPPERT v. WOLF.

REVERSIBLE ERROR; WITNESSES.

It is error for a trial judge to use such harsh and severe language to a witness during a trial, and to make such comments on his testimony in the charge, as tends to discredit his testimony.

No. 326.   Submitted November 6, 1894.   Decided December 3, 1894.

HEARING on a bill of exceptions by the caveators in a contest involving the validity of a will.   *Judgment reversed.*

The COURT in its opinion stated the case as follows:

This is a contest over the validity of a will upon issues sent from the Orphans' Court.   Christian Ruppert, a native of Germany, but for many years a resident of the city of Washington, died in this city on August 6, 1891, leaving a large estate, and leaving also a document which purported to be his last will and testament, whereby he assumed to dispose of this estate.   The will was executed on May 20, 1891; and there was a codicil to it executed on August 4, 1891.

Ruppert's wife survived him, but they had no children; and his next of kin are his three brothers, a sister, and the son of a deceased brother.   To each of these, except one brother, Ernst, he gave annuities during the lifetime of his wife, and legacies upon her death; but the annuity and legacy that otherwise might have gone to his brother Ernst, was left to the wife and children of the latter.   Then, after the creation of some other legacies, he devised and bequeathed the bulk of his estate to the three executors named in the will, Simon Wolf, George Emmert, and William G. Johnson, to be held and managed by them as trustees for the benefit of his wife during her life, and upon her death to establish

and maintain an institution for aged and indigent Germans, under the name of "The Christian and Eleonora Ruppert Home."

When the will was offered for probate, a caveat to it was filed by Ruppert's three brothers and nephew; but Gustav Ruppert, one of the brothers, subsequently withdrew from the contest, apparently for the purpose of becoming a witness in the proceedings that were contemplated. Twenty issues were thereupon formulated in the Orphans' Court, of which nine were subsequently withdrawn and the remaining eleven were transmitted to the common law branch of the Supreme Court of the District of Columbia, to be there submitted to a jury. The issues that were withdrawn had reference mainly to the question of the formal execution of the will. The eleven issues that were transmitted for trial involved in different forms the three principal questions usually raised in such cases, namely: 1st. Mental capacity; 2d. Undue influence; 3d. Fraud, misrepresentation and artifice practiced upon the testator.

At the trial, the question of mental capacity was in great measure, if not wholly, abandoned; and the issues that involved fraud, misrepresentation and artifice, as distinguished from undue influence, do not seem to have been strenuously pressed. The substantial controversy was upon the question of undue influence.

The verdict of the jury was in favor of the caveatees or proponents of the will, upon all the issues; and the validity of the will was sustained. The caveators have now brought the case here upon exceptions taken to the rulings of the court during the progress of the trial, and to the instructions given by the court to the jury. Upon these exceptions thirty-seven assignments of error, grouped under eight different heads, are based by the appellants.

*Mr. A. S. Worthington* and *Mr. Leon Tobriner* for the appellants.

*Mr. Wm. F. Mattingly* and *Mr. Calderon Carlisle* for the appellees.

Mr. Justice MORRIS delivered the opinion of the Court:

In the view that we have taken of the case, it becomes unnecessary for us to consider these assignments of error in detail, inasmuch as most of the errors complained of, if they are errors, are not such as would necessarily occur in a new trial, and the questions of law which they involve are not such as demand urgent settlement by an appellate tribunal.

While in the testimony in this case, as it is set forth in the record before us, we find no evidence whatever of mental incapacity on the part of the testator, and no evidence worthy of serious consideration to show fraud, misrepresentation or artifice; and while, upon the question of undue influence as here presented, we cannot see how the jury could have rendered any other verdict, under the circumstances, than that which they did render.; yet we are constrained to hold that there was grave error on the part of the court below in respect of one feature of the case.

Among the witnesses called to testify on behalf of the caveators was one Louis Upmann, who had been in the service of Christian Ruppert as general manager of the business of the latter, which was the conduct of a notion and toy store, from the year 1884 to the time of Ruppert's death. Upmann testified, among other things, and with considerable detail, to the fact that two fires had occurred in Ruppert's store during the year 1890, one in May and the other in December; and he stated that Ruppert confessed to him that he (Ruppert) had himself set fire to the store on both occasions, in order to get the insurance money and to get out of the business. He added that he (the witness) had co-operated with Ruppert to make false entries on the books and to concoct false statements for the purpose of defrauding he insurance companies; and that he (witness) supposed that Mr. Simon Wolf, one of the executors of the will,

must have had knowledge of Ruppert's action, and thereby acquired influence over him. At the conclusion of the examination of this witness by counsel, the justice who presided at the trial undertook to examine him, and the following colloquy and proceedings took place:

"Q. Who was the man that you went away with at recess?—A. I do not know the gentleman. His name is Lawrence. That is all I know.

"Q. Thomas Lawrence, is it not?—A. I do not know who he is.

"Q. You do not know him?—A. No, sir.

"Q. Where did you meet him?—A. Mr. Block introduced me.

"Q. Do you not know he was convicted in this court of larceny from a person?—A. Mr. Block asked me to keep him in view and give him a good time, and I did so. I do not know anything of the man.

"Q. He was in here right after recess; came in here after you did?—A. We occupied the same room in the National Hotel last night. I do not know the man.

"The Court: On your own statement you ought to be where that man was, who was sentenced a year ago—in the Albany Penitentiary.

"The Witness: I did not know anything about that. I did not do anything wrong.

"The Court: If I were holding the Criminal Court, I would hold you for the grand jury.

"Mr. Worthington: Will your Honor allow us to take an exception to that?

"The Court: Yes, sir—take all the exceptions you desire. He is an unmitigated scoundrel on his own statement.

"Mr. Cook: We desire to take an additional exception to that."

Subsequently, in his charge to the jury, the presiding justice, with reference to this same witness Upmann, used

the following language, to which exception was duly taken by counsel for the caveators:

"With reference to the fact charged that this deceased man, whose mouth is closed and whose reputation is assailed by such insinuations, was an incendiary, if I recollect right, there is no evidence in the case except the evidence of one man named Upmann. Upmann proclaimed his own rascality in the court room; he advertised himself in your presence and in the presence of all the people in this court room as a man who was unworthy of confidence, and a man who would be guilty of the perpetration of any scoundrelly act. I felt it to be my duty, filling this responsible public position, to characterize him in your presence as I thought he deserved. Had he been a witness in the Criminal Court and announced his own infamy as he did in this Circuit Court, and I had been holding that court, I should have directed the marshal to take him into custody at once, and hold him at once for the action of the Grand Jury. It may be that what he said was absolutely false. Taking him, however, upon his own statement, if he had been making such a statement in the Criminal Court it would have been the duty of the judge holding that court to have held him for the action of the grand jury."

We can readily understand how, in the presence of confessed guilt on the part of this witness and of testimony implicating his deceased employer in a crime of which no one during his lifetime would have supposed him capable, the just indignation of the presiding justice must have been aroused. And it may be, also, that there was something in the manner and conduct of the witness in the court room that served to intensify this indignation. But in view of what the Supreme Court of the United States has pointedly said in the case of *Hicks* v. *United States,* 150 U. S. 442, and yet more pointedly in the more recent case of *Starr* v. *United States,* 153 U. S. 614, we must hold the utterances of the

learned justice in this case as unduly prejudicial to the cause of the caveators and as constituting grave error.

In the case of *Hicks* v. *United States*, the Supreme Court, by Mr. Justice Shiras, said : " It is not unusual to warn juries that they should be careful in giving effect to the testimony of accomplices; and perhaps a judge cannot be considered as going out of his province in giving a similar caution as to the testimony of the accused person. Still it must be remembered that men may testify truthfully, although their lives hang in the balance; and that the law in its wisdom has provided that the accused shall have the right to testify in his own behalf. Such a privilege would be a vain one if the judge, to whose lightest word, properly enough, the jury give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability. The wise and humane provision of the law is that ' the person charged shall, at his own request, but not otherwise, be a competent witness.' The policy of this enactment should not be defeated by hostile comments of the trial judge whose duty it is to give reasonable effect and force to the law."

In that case a person charged with crime had testified on his own behalf; and because his statements were in some respects controverted by other witnesses, the presiding justice gave the jury to understand that the testimony of the defendant was discredited by the fact of his interest in the result, and that they should rather believe the other witnesses, who, as he said, " told the truth." This was virtually taking the question of the credibility of the witness from the jury, to whom it properly and exclusively belonged, to determine that question ; and the Supreme Court held that it was error.

The case of *Starr* v. *United States* was somewhat extraordinary in some of its features. The indignation of the presiding justice had been aroused there as in the present case;

4 Ct. App.—36

although there the indignation was directed against the defendant in the case and not against a witness. Reviewing the case upon writ of error, Mr. Chief Justice Fuller, speaking for the Supreme Court of the United States, said : " It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with ·deference and may prove controlling. *Hicks* v. *United States*, 150 U. S. 442, 452. The circumstances of this case apparently aroused the indignation of the learned judge in an uncommon degree, and that indignation was expressed in terms which were not consistent with due regard to the right and duty of the jury to exercise an independent judgment in the premises, or with the circumspection and caution which should characterize judicial utterances."

And then, after quoting some of the more objectionable utterances in question, Mr. Chief Justice Fuller proceeds to say: " These expressions are qualified to some extent by other parts of the charge, which we cannot give at length ; but we are constrained to express our disapprobation of this mode of instructing and advising a jury. Whatever special necessity for enforcing the law in all its rigor there may be in a particular quarter of the country, the rules by which and the manner in which the administration of justice should be conducted are the same everywhere, and argumentative matter of this sort should not be thrown into the scales by the judicial officer who holds them." And for the error of the trial judge in this regard the judgment against the defendant in that case was reversed.

These comments of our highest and most honored tribunal we must regard as appropriate to the case before us and as controlling our decision. It is the duty of courts to protect witnesses and litigants from insolent abuse and violent denunciation, in which counsel are too often inclined to indulge. Innocent parties are often required to go into court

against their will; and witnesses may almost always be presumed to be there under compulsory process. It would be a disgrace to our jurisprudence if counsel are to be allowed, with impunity, to subject them to insult and contumely. Much more is it the duty of the presiding judge to refrain from the expression even of harsh comment. There may often be developments before him sufficient to excite his indignation as a man; and possibly the case now before us may have furnished such an occasion. But even in such cases a witness is entitled to the protection of the law, and to immunity from violence. A person may be competent to testify as a witness and be compelled by process to appear as such, who has been convicted of crime; and it does not necessarily follow that his criminal conduct should discredit him with the jury. Certainly it does not follow that the presiding judge should by his own emphatic utterances seek in advance to discredit him with them, and thereby unduly to influence their determination of the question of his credibility.

It is very true that in this case, as in the case of *Starr* v. *United States*, the presiding justice subsequently qualified his charge and gave the jury to understand that it was for them to determine the question of the credibility of the witness; but the mischief had already been done, almost beyond the power of undoing. It is also true that the testimony of the witness, Upmann, even if we give it the credit to which it does not seem to be entitled, of being a perfectly truthful statement of facts, does not, in our opinion, go far, if at all, to prove the charge of undue influence upon the testator which it is intended that it should support. But the record, although voluminous enough, does not purport to give the substance of all the evidence; and it is not for us, therefore, to determine how far the discrediting of Upmann and of his testimony affected the case of the caveators in the minds of the jury.

We are constrained to hold that there was error in the comments of the justice who tried this case with regard to the witness Upmann, and in his charge to the jury with respect to his testimony; and for that error, without reference to any other question in the case, *we must reverse the judgment, with costs, and remand the cause with directions that the verdict of the jury be set aside and a new trial of the issues be awarded.    And it is so ordered.*