STATE OF IOWA, Appellee, v. ROY BALL, Appellant.

No. 42881.

JULY 17, 1935.

REHEARING DENIED DECEMBER 19, 1935.

Robertson & Robertson, for appellant.

Edward L. O'Connor, Attorney General, Walter F. Maley, First Assistant Attorney General, and Robert B. Organ, County Attorney, for appellee.

ALBERT, J.—The major question discussed on this appeal is as to the sufficiency of the evidence to support the verdict. Under the record made, the jury could have found the following facts:

On the 6th of May, 1934, the defendant, Ball, and two others, named Murray and McKay, went by automobile to Omaha, leaving Des Moines about 9:30 o'clock p. m. They returned from Omaha and reached Avoca about 7:30 p. m. on the next day, May 7. They spent about an hour in the town of Avoca, and between 8:30 and 9 o'clock p. m. they started north on highway No. 7. At the north edge of town and on the west side of said highway stands a building of the state highway commission, which is used for a storage and machine shop. It is about 150 feet west of the highway, which it faces, and on the east side of the building are two large doors and a small one. Across the highway, and practically opposite said building, is a residence occupied by Harry Bailey. He was sitting on his porch and heard a noise at the highway garage which attracted his attention, a hammering on the door. He saw two men at the garage and saw the light go out. This light was over the small door. He called Jack Graham, who was foreman of the highway commission, and saw Jack come to the garage that night. He did not see the defendant around the garage that evening, or anywhere on the road.

Graham testifies that he is foreman of the Iowa state highway commission. He responded to Bailey's call, and he and one Ted Nieman went to the garage. The light on the east side, over the door, was broken. He had locked the garage door when he left about 5:30 in the evening. As he drove to the garage the lights of his car were focused on the door. He saw one man come out and run north across the pasture. Just at that time another man came out and the witness grabbed him and he was turned over to the deputy sheriff, Eckhart, who, in the meantime, had appeared upon the scene. The hasp and padlock on the small door were broken and the staple holding the same was pulled out. He examined the interior of the garage and found one of the state highway commission's ten-gallon

cans sitting by the gasoline pump, in the neighborhood of about half full, maybe a little more. The tool drawer of the bench was open. The gasoline pump was located inside the garage. South of this highway commission garage, some 10 or 15 feet away, stood a tractor which belonged to the state. About 40 rods north of the garage, and running west, is a dirt road. The witness Graham had passed this garage about 7 or 8 o'-clock in the evening, and it was apparently all closed at that time.

The witness Nieman confirms the statements of the witness Graham, and says that they drove north on highway No. 7 to the dirt road, and turned west. They noticed a car flash on its lights and start up. The car started west, turned the corner north, and they followed for about two miles and got close enough to observe that it bore a 77 county license. It was a Model A Ford. They saw the same car the next day in a garage in the town of Avoca. The man captured at the garage and the one running north were George Murray and Oren McKay. This car bearing the 77 county license number was later found alongside the cemetery. In it was found a blue coat that belonged to the defendant Ball, and the car was empty of gas. The man captured at the garage was George Murray.

The witness Schmidt, an agent for the bureau of investigation of Iowa, interviewed the defendant on the 9th of May, in Des Moines, and questioned him as to his whereabouts on the two or three preceding days. He answered that he was in Des Moines, hauling ashes. He denied that he was in Avoca during that time. He instructed the defendant to go to his home and wait until the witness saw him. Later the witness went to the defendant's home and the defendant was not there, but he found him in Marshalltown the following day. The defendant said that he was living with a woman who was not his wife, and he was afraid of getting in trouble on that account. The defendant was then arrested and turned over to the Pottawattamie county authorities. He told the witness he was trying to get some money to go to Missouri and be married. He denied that he was with McKay and Murray when they broke into this garage, and denied being with them at all. He told the witness he went to Marshalltown in the hope of getting some money to marry this woman that he was living with.

Perry, the sheriff of Pottawattamie county, testifies that he

had an interview with the defendant after his arrest, and defendant said that when they came to this highway garage in Avoca he let those two men out of the car. *They were short of gasoline.* He said he was driving the car at that time. *He let those two men out with the understanding that they would go over to the tractor and get some gasoline.* He then drove north on No. 7 and turned and drove west on the dirt road *"to wait for those fellows to get the gasoline."* When he saw the car drive into the garage, with the lights on, he knew there was something wrong at the garage. He further said that when he pulled his car onto the dirt road he was to wait there for those two men to come with the gasoline. The witness further said that he (defendant) said to McKay and Murray when they went to get out of the car and go over to this tractor to get some gas to get home on, that he (Ball) would not have anything to do with that, that he had just got out of trouble, out of the penitentiary, and he told them that he would not have anything to do with that. "He told me he was going to stop and wait until they got the gasoline. He told me that after he ran out of gas with this car he was driving he left it by the cemetery, and he started to walk to the town of Walnut and some farmer driving a truck picked him up and took him in to Walnut, and that he there got a train and rode into Des Moines. He told me that when McKay and Murray left the car they were going over to this tractor and get some gas out of that. He found out about McKay and Murray breaking into the building afterwards, about two days later. He told me that when the car drove up (to the garage) with the headlights on, he knew there was something wrong."

In the county attorney's office in Pottawattamie county the defendant signed a written statement taken down by the stenographer. "He told his own story in his own way in answer to our questions." Defendant had been brought over to the county attorney's office by the deputy sheriff so that they could get a statement from him. The defendant always claimed that he had nothing to do with breaking into the building. In the written statement made by the defendant, he states:

"We got to Avoca about 7:30 p. m. We went into a restaurant and got a sandwich apiece. I spent my last money to buy gasoline in Omaha. We did not have much gasoline when we

got to Avoca. After we got the sandwiches we started out of town. McKay said, 'We got to get some gas.' We saw the highway garage. He said: 'We'll try and get some out of a tractor parked there.' I said, 'Don't break in any place to get gasoline because I don't want to get in any trouble.' I begged them not to break in and get into trouble. *When I found out that they were going to break in, I drove up the road. I parked on the road north of the shed. I was headed west.* I never saw McKay or Murray after they got out of the car. It was not my idea to go back and pick up the boys. If I had seen them I would not have picked them up because I was mad. When I drove by I saw the car drive up and figured the boys were caught. When I saw this I sailed right along. I parked the car across from the cemetery. I left the car because I did not want to have any trouble. I cut across the field walking home. I walked all of the way to Walnut with the exception of about one and one-half miles when a fellow picked me up in a stock truck. He was going to Walnut. I got into Valley Junction a little after six o'clock in the morning on Tuesday, May 8, 1934. I told my wife I had to leave the boys because they stole some gasoline.''

The question is whether, under this set of facts, the defendant was rightfully convicted by the jury.

As heretofore noted, the defendant was charged with breaking and entering this building in the nighttime. Great stress is laid upon the confession made by the defendant wherein he denies any knowledge of the breaking and entering, or any knowledge of any intention on the part of his two associates to break and enter the building; and it is insisted that because this written confession was introduced by the state, the state is bound thereby, and, being thus bound, its own evidence shows that the defendant could not have been guilty of breaking and entering said building. While it is true that the state introduced this confession in evidence, the contention of the defendant cannot be sustained that the state is bound by the exculpatory statements contained therein. These statements must be considered in the light of the surrounding facts and circumstances, and other statements made by the defendant in such written statement, and when so considered are, of necessity, a question for the jury.

We have had this question before us in the case of State v. Richardson, 240 N. W. 695, loc. cit. 700, where the identical question is raised, and we there said:

"Manifestly the falsity of the exculpatory statements may be shown by circumstantial or direct evidence."

While the exculpatory statements made in said written confession must be considered by the jury in reaching a verdict, it cannot be said that because of the same they are final. The rule governing these matters is quite tersely stated in 16 C. J., p. 738, section 1517, as follows:

"The rule that a confession is to be considered in its entirety does not compel the jury to give the same belief to every part of it. The jury may attach such credit to any part of it as they deem it worthy of, and may reject any portion of it which they do not believe. All of it must be weighed carefully by the jury, and upon all the circumstances surrounding the case they must determine how much of it they will receive and how much they will reject."

We think, therefore, under this rule, which seems to be quite universal, that the exculpatory statements contained in this confession, and the weight to be given to them made a question of fact for the jury.

The state does not contend that the defendant was personally present and actively took part in the breaking and entering of the building. The case was tried on the theory that the defendant Ball was an accessory to the breaking and entering. We have reviewed the evidence with care, and after reading the record several times, we are disposed to think that the guilt or innocence of the defendant, under this situation, was a question of fact for the jury. The defendant, in his statement, says: "I begged them not to break in and get into trouble." While the conversations that took place between these parties are not before the court, the primary object seems to have been to get a supply of gasoline so that they might get back to Des Moines. Certainly something must have been said which would call forth from the defendant the statement above quoted. He further says: "When I found out they were going to break in, I drove up the road." This shows a knowledge or realization on his part that they were going to break into the building. He fur-

ther says in his statement: "It was not my idea to go back and pick up the boys. If I had seen them I would not have picked them up, because I was mad." This necessarily ties up with his former statement that when he found out they were going to break in he drove up the road; and he expresses himself as having been "mad," presumably because the other boys were going to break into the garage. The sheriff testifies that the defendant told him that he drove north on No. 7, turned and went west on the dirt road, to wait for those fellows to get the gasoline; and that when he saw the car approaching the garage with its lights on, he knew there was something wrong at the garage. The primary thought and understanding that seem to have existed in the minds of the defendant and his associates were to get gasoline to supply their car.

The jury might have found from the evidence in this case that the purpose of all these parties was to get a supply of gasoline for their car, and, as stated by one witness, the defendant admitted that that was the understanding; and, although he was not present at the physical breaking into the building, yet, under the facts and circumstances shown in the record, he was an accessory to the same under the rules governing and defining accessory.

▌▊▌ II. Complaint is made of certain instructions because these instructions did not contain the statement that the matters therein referred to were to be proved beyond reasonable doubt. Instruction No. 5 given set out the elements that constitute the crime charged. In instruction No. 6 the jury was told that the burden of proof was upon the state to establish all of the material evidence beyond all reasonable doubt. The instructions against which complaint is lodged simply elaborate the matters set out in instruction No. 5, and it was not necessary, under such circumstances, to include in each of the instructions the proposition as to reasonable doubt, because the instructions are to be read together, and when so read they are not vulnerable to the assault made upon them.

III. Complaint is made that the punishment inflicted is excessive, cruel, and unusual punishment. The record in the case shows, and the jury found, on special interrogatories, that the defendant had been convicted in 1916 in the district court of Marshall county, of the crime of attempting to break and enter, and was sentenced to the State Reformatory at Anamosa

for a period not exceeding five years. Also on the 26th of September, 1922, in the same court, he was convicted of the crime of breaking and entering, and was sentenced to the State Penitentiary for a period not exceeding ten years. On September 13, 1922, in the district court of Story county, he was convicted of the crime of grand larceny, and sentenced to the State Penitentiary for a period not exceeding five years. On the 21st day of April, 1931, he was convicted of the crime of larceny of domestic fowls and committed to the State Penitentiary for an indeterminate period not exceeding five years. Hence, prior to this trial, he had been sentenced for four different felonies. Under the habitual criminal act (section 13396, Code 1931), this sentence was authorized.

We have given attention to some other alleged errors, but find nothing in them that would warrant a reversal of the case.—Affirmed.

ANDERSON, POWERS, PARSONS, DONEGAN, and HAMILTON, JJ., concur.

MITCHELL, J., and KINTZINGER, C. J., and RICHARDS, J., dissent.

MITCHELL, J. (dissenting).—I find myself unable to agree with the majority's opinion, and therefore respectfully dissent.

The defendant in this case was charged with the crime of willfully and unlawfully breaking and entering a public building with intent to commit a public offense therein, to wit: larceny. The evidence consisted of the statements made to the sheriff of Pottawattamie county and a state agent, by the defendant, and a written statement made by him, which is referred to in the record as Exhibit 4.

It is conceded that the defendant was not present and took no part in the breaking and entering of the building, and the case as to him was submitted to the jury only on the issue of whether he aided, abetted, or assisted in the commission of breaking and entering said building.

The defendant with two other men had driven from the city of Des Moines to Omaha. They had started back and had reached the town of Avoca, where they stopped for lunch along in the evening. It was dark. They were getting short of gasoline. The defendant was driving the car. However, it was not

his car, but belonged to a lady friend of one of the men with him. They drove past a warehouse which belonged to the state highway commission. Along the road a tractor stood. The defendant stopped the car. The sheriff and state agent both testified that in the statements made to them by the defendant he at all times claimed he understood they were going to get the gasoline from the tractor which was out in the road, and that he protested to his two companions against taking gasoline or breaking or entering any building. The defendant is not charged with the crime of larceny. He is charged with breaking and entering. There is not a scintilla of evidence in this record which shows that at the time the two men with the defendant left the car they intended to break into this public building. The undisputed evidence shows that he protested to his companions against the breaking into of any building. He remained in the car some distance from the tractor and the building. He could not see where his companions went, because it was dark. He did not know for two days afterwards that they had broken and entered this building. But, the majority say:

"The defendant, in his statement, says: 'I begged them not to break in and get into trouble.' While the conversations that took place between these parties are not before the court, the primary object seems to have been to get a supply of gasoline so that they might get back to Des Moines. Certainly something must have been said which would call forth from the defendant the statement above quoted. He further says: 'When I found out they were going to break in, I drove up the road.' This shows a knowledge or realization on his part that they were going to break into the building."

Even conceding that he had knowledge, which I do not think the record shows, that they were going to break into the building, that would not, in my judgment be sufficient to say that this man was guilty of breaking and entering. He continually protested. In his own words, he "begged" these other men not to break and enter. That is the undisputed record.

This court in the case of State v. Bosworth, 170 Iowa 329, on page 345, 152 N. W. 581, 588, said:

"An instruction is erroneous if it authorizes the jury to convict the defendant, because of his presence or mere mental

approval or consent, without requiring that he shall have aided in or encouraged the commission of the crime. * * * Mere passive failure to disclose the commission of a crime will not make one an accessory. Davis v. State, 96 Ark. 7, 130 S. W. 547, 549. In Hicks v. United States, 150 U. S. 442, 14 S. Ct. 144, 37 L. Ed. 1137, a case which appellant erroneously cites for the claim that the court should have instructed more specifically on the definition of aider and abettor, it is, however, held that the mere use of words, the effect of which is to encourage another to commit a crime, does not make the user thereof an aider and abettor unless he intended them to have that effect."

In the case at bar we do not have a man using words to encourage his companions to commit the crime. We have an undisputed record that he did everything in his power to prevent them from committing a crime. He protested. He begged. And when he found out what they were going to do, he drove away. And yet, upon such a record this man is convicted of the crime of breaking and entering and is sentenced to the penitentiary for a period of forty years.

This court, in the case of State v. Wolf, 112 Iowa 458, 463, 84 N. W. 536, 538, said:

"It has never been held, so far as we are advised, that mere presence at the scene of crime constitutes aiding and abetting. Indeed, it is elementary that such is not the case. Nor is it sufficient, in addition thereto, that the person present mentally approves what is done. 'The party to be charged must,' in the language of Cockburn, C. J., 'incite or procure or encourage the act.' Bish. Cr. Law, sections 628-633. The court in this instruction told the jury, in effect, that, if the defendants were near enough to give Icenbice's acts countenance and support, they were guilty as principals. This doctrine would make a principal of every man whose curiosity tempted him to stop and look for a moment at any transaction involving a crime. The instruction cannot be sustained, and was prejudicial to the defendants."

In the case at bar all of the evidence shows that this defendant protested against the commission of the crime. In the case cited the courts said that mere presence and mental approval is not sufficient. "The party to be charged must * * * incite

or procure or encourage the act.'' Where in this record the majority find any evidence to show that the defendant incited, procured, or encouraged the commission of the breaking into and entering of this public building, I am unable to ascertain.

As I read this record, there is not sufficient evidence—in fact, I find no evidence that would sustain a verdict against this defendant that he aided, abetted, or counseled McKay and Murray in breaking into said building. It was the duty of the lower court, upon the motion of the defendant made at the close of the evidence, to direct a verdict, and the lower court having so failed, I would reverse the case.

I am authorized to state that Chief Justice KINTZINGER and Justice RICHARDS join in the dissent.