Brenda Sue GLASS, Appellant,

v.

UNITED STATES, Appellee.

Louis E. DAVIS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 11167, 11352 and 12515.

District of Columbia Court of Appeals.

Argued Feb. 9, 1978.

Decided Nov. 16, 1978.

Wallace E. Shipp, Jr., Washington, D. C., for appellant Glass; Daniel H. Brown, Washington, D. C., on brief, for appellant.

Harry B. Allen, Oxon Hill, Md., for appellant Davis.

Cheryl M. Long, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell and Harry R. Benner, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before KELLY, GALLAGHER and NEBEKER, Judges.

GALLAGHER, Associate Judge:

Following a jury trial, appellants Brenda Glass and Louis Davis were convicted of armed robbery (D.C.Code 1973, §§ 22–3202, –2901). On appeal, both appellants raise four identical claims of error: (1) they were denied their rights to a speedy trial; and (2) the trial court erred in (a) denying their motions to suppress certain tangible evidence, seized in violation of their Fourth Amendment rights; (b) denying their motions to suppress certain identification testimony, allegedly resulting from an impermissibly suggestive pretrial confrontation, and (c) denying their motions for judgments of acquittal. Appellant Davis argues separately that: (1) the trial court committed error with respect to his motions for a new trial; and (2) his impeachment with prior convictions by his codefendant's counsel constituted reversible error.[1]

This trial and appeal arose out of an incident occurring on February 13, 1975. Sometime between 4:30 and 5 a. m., Danny Monroe, the night clerk at the Parkland Tourist Home in Anacostia, responded to the doorbell. He admitted a white woman (later identified as appellant Brenda Glass) and a black man (later identified as Emanuel Durant).[2] Believing the couple desired to rent a room, Monroe resumed his place behind the registration desk. Durant pulled a gun on Monroe, announced that he was being held up, and told him to push the buzzer to open the front door. Monroe replied that there was no such buzzer and consequently one of the two entrants opened the door for a third cohort, a white man (later identified as Danny Glass, the brother of appellant Brenda Glass).[3] Danny Glass ordered Monroe to take off all of his clothes and then bound his hands and feet with his clothes. After the three fled, and Monroe was able to free himself, he discovered eleven dollars and a set of keys had been taken from one of his pockets.

1. Appellant Glass argues on her part that the prosecution committed reversible error by impeaching one of its own witnesses during closing argument, without either announcing surprise or declaring the witness hostile. We deal with this later.

2. Durant entered a plea of guilty under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), to armed robbery (D.C.Code 1973, §§ 22–3202, –2901).

3. Danny Glass entered a guilty plea to robbery (D.C.Code 1973, § 22–2901).

Also, a travel clock was missing from the switchboard.

At about 5 a. m. the same morning, Officers Allen White and Charles Holly saw a car run through a red light on Martin Luther King Avenue, at a location that is about five to ten blocks from the scene of the robbery. The car was eventually stopped about two or three blocks from the light and Officer Holly exited the police cruiser to speak to the driver, appellant Louis Davis. Meanwhile, Officer White heard a flash lookout for three robbery suspects. The descriptions of the three seemed to him to fit three of the four occupants in the car and Officer White called for a back-up unit of officers who took the four occupants of the car into custody and drove them back to the scene of the crime. When shown to Monroe at the tourist home, he identified three of the four as the robbers. Those three were Brenda Glass, Danny Glass and Emanuel Durant. Subsequently, Brenda Glass and Louis Davis were indicted jointly on identical counts of armed robbery (D.C.Code 1973, §§ 22–3202, –2901), robbery (D.C.Code 1973, § 22–2901), and assault with a dangerous weapon (D.C.Code 1973, § 22–502).[4]

### I.

Appellants Glass and Davis seek reversal of their convictions on the ground that their constitutional rights to a speedy trial were violated by a thirteen-month delay between arrest and trial.[5] Although there is presented a substantial issue, we disagree.

Glass and Davis were arrested on February 13, 1975, and indicted on March 19, 1975. At that time they were arraigned and the trial date was set for June 20. On April 30, however, at a status hearing the trial date was continued until August 13 because Ms. Glass anticipated being hospitalized for her pregnancy at the earlier June 20 date. On August 6 another status

**4.** These latter counts were later dismissed by the trial court.

**5.** The remedy for the denial of the right to a speedy trial is dismissal of the indictment.

hearing was held and the date for trial continued until October 14—the reason for this continuance not being apparent from the record. At a status hearing on September 18, the trial date was again changed—to November 6—because the trial judge was scheduled to be away on October 14. On November 6 the prosecutor was unavailable to go to trial, since he was busy with another case and the court continued the trial date to December 8. On December 8 the court was occupied with another trial and continued this case for trial until January 15, 1976. On January 12 the date for trial was changed to January 16, without explanation. On January 16, 1976, the government was not prepared for trial and consequently the trial court dismissed, without prejudice, the indictments for want of prosecution. On January 21 identical indictments were filed against appellants. On February 17 only appellant Glass filed a motion to dismiss the indictment on speedy trial grounds. The trial court denied the motion and this case went to trial on March 12, 1976.

The burden of ensuring that criminal cases are promptly brought to trial is on the courts and the prosecution. *Barker v. Wingo,* 407 U.S. 514, 529, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Branch v. United States,* D.C.App., 372 A.2d 998, 999–1000 (1977) (hereinafter cited as *Branch* ). In *Barker v. Wingo, supra,* the Supreme Court set forth a four-pronged balancing test to determine whether the courts and prosecution have satisfactorily discharged that burden or, instead, denied an accused his Sixth Amendment right to a speedy trial. The four factors to be balanced are: (1) the length of the delay; (2) the reasons for the delay; (3) the assertion of the right by the defense; and (4) the prejudice to the accused. We consider these factors, seriatim, as they apply to each appellant.

*Barker v. Wingo,* 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Branch v. United States,* D.C.App., 372 A.2d 998, 1000 (1977).

### Length of the Delay

Since there was a delay of over one year in this case—about thirteen months—between arrest and trial, both of appellants' claims have prima facie merit. *Crowder v. United States*, D.C.App., 383 A.2d 336, 338–39 (1978); *United States v. Perkins*, D.C.App., 374 A.2d 882, 884 (1977). Consequently, "[a] heavy burden then shifts to the government to justify the delay." *Crowder, supra* at 339; *Branch, supra* at 1000. Furthermore, as the Supreme Court noted in *Barker v. Wingo, supra* 407 U.S. at 531, 92 S.Ct. at 2192, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." Thus, "the longer the delay and the less serious the offense, the heavier the government's burden will be." *Branch, supra* at 1000; *United States v. Holt*, 145 U.S.App.D.C. 185, 186, 448 F.2d 1108, *cert. denied*, 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971).[6]

Here, the prosecution is responsible for the delay between November 6, 1975 and December 8, 1975, because the trial was continued due to the prosecutor's unavailability. Moreover, the prosecution concedes that it is responsible for the delay between January 15, 1976 and March 12, 1976 as a result of its not being ready to proceed to trial. Thus, this amounts to a delay of about thirteen weeks, or a little over three months. The prosecution is also chargeable with the "neutral" delay resulting from court congestion and other institutional impediments, *United States v. Perkins, supra* at 883, but this is not "given as much weight as deliberate prosecutorial delay." *Reed v. United States*, D.C.App., 383 A.2d 316, 319 (1978), *citing Barker v. Wingo, supra* 407 U.S. at 530, 92 S.Ct. 2182. The neutral delay amounts to a little over eight months. The delay chargeable to the defense is apparently about two months— from June 20, 1975 until August 13, 1975—

as a result of appellant Glass' hospitalization for pregnancy. This delay is directly attributable to her, but not to appellant Davis. His counsel could have objected to the delay, and filed both a motion to sever and a request for a speedy trial.

### Reason for the Delay

As we have just noted in our discussion of the length of delay, the reasons for the delay are four. First, the prosecution's delay in one instance—for five weeks—was because the prosecutor was unavailable due to his presence at another trial. This delay should not be categorized as deliberate, at least not in the sense of attempting to achieve a tactical advantage. *Compare Branch, supra* at 1001. Second, the prosecution caused a delay for about eight weeks, due to its lack of preparation for trial. Negligence is considered another neutral reason for delay—properly attributable to the prosecution. *Barker v. Wingo, supra* 407 U.S. at 531, 92 S.Ct. 2182.

The third reason for the delay is the hospitalization of Ms. Glass for her pregnancy and thus, as noted previously, is properly chargeable to her, and no motion was filed by appellant Davis to sever. The fourth reason is institutional—primarily due to court congestion—and thus is weighed against the prosecution.

### Assertion of the Right

"The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker v. Wingo, supra* 407 U.S. at 531–32, 92 S.Ct. at 2193. Here, on February 17, 1976—a little over twelve months after arrest—appellant Glass first[7]

---

**6.** In *United States v. West*, 164 U.S.App.D.C. 184, 504 F.2d 253 (1974), the court dismissed the indictment because the defendant had been in custody for thirteen months, the crime was not violent, the issues of law and fact were not complicated and the defendant was not respon-

sible for any of the delay—rather, the delay was due to court congestion.

**7.** On appeal she claims that she asserted her right to a speedy trial on each of three occasions when the trial had been postponed. She

asserted her right to a speedy trial in a motion to dismiss her indictment. Consequently, the earlier delay did not occur "in the face of a speedy trial demand and is accorded less significance than if appellant had raised the speedy trial issue at an earlier date." *Reed v. United States, supra* at 319, *citing United States v. Jones,* 173 U.S. App.D.C. 280, 297, 524 F.2d 834, 851 (1975). Moreover, it is important that trial began within one month after the assertion of the right. *Compare Bethea v. United States,* D.C.App., 395 A.2d 787 (No. 11934, decided this date) (trial delayed almost six months after demand).

The record does not reveal that Davis ever requested a speedy trial, objected to any continuances, or filed a motion to dismiss his indictment on speedy trial grounds. He does raise an ineffective assistance of counsel claim in connection with another issue.[8] This claim only relates to his second trial counsel, appointed on January 29, 1976. Consequently, like appellant Glass, Davis would have failed to assert his right for almost twelve months after arrest.

### Prejudice to the Defendant

■ Because of the merit presumed in this speedy trial claim, the burden rests on the government to show no prejudice to the accused. *Day v. United States,* D.C.App., 390 A.2d 957, 970 (1978).[9] In doing so, we must note three major considerations: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. *Barker v. Wingo, supra* 407 U.S. at 532, 92 S.Ct. 2182.

■ Neither appellant was incarcerated pretrial. However, "even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility." *Barker v.*

*Wingo, supra* 407 U.S. at 533, 92 S.Ct. at 2193. Appellant Glass asserts that the lengthy delay burdened her with anxiety and concern about the pending charges—especially because of her pregnancy which culminated in a child born before trial. She was, however, able to obtain a two-month continuance of the trial in order to give birth to the child—thus minimizing her anxiety to a certain extent. Appellant Davis does not assert that he was anxious or concerned about the pending proceedings. Appellant Glass argues that her defense was impaired because the memory of her allegedly exculpatory witness, Danny Monroe, had to be refreshed with his grand jury testimony. We do not think his relevant lapses of memory were particularly significant and such prejudice as arguably might have occurred was cured through her use of the grand jury transcript to refresh his recollection and to place his prior statements—for impeachment purposes—before the jury. Appellant Davis, on the other hand, does not argue he was prejudiced in his defense by the delay, but asserts that no showing of prejudice is essential to prove a denial of his right to a speedy trial, citing *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975) and *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973). Although no showing of prejudice is required to establish the denial of one's speedy trial right, *Moore v. Arizona, supra* at 26, 94 S.Ct. 188, it still is a factor to consider in the overall balancing process. *See e. g., Day v. United States, supra* at 970–73; *United States v. Perkins, supra* at 885; *United States v. Calhoun,* D.C.App., 363 A.2d 277, 281–82 (1976).

We do not find any reasonable likelihood of prejudice to either appellant's defense preparation as a result of the lengthy delay here. Consequently, we think that the government has carried its burden. *Day v. United States, supra* at 970, 973.

8. *See* text *infra* at Part VI.

9. "[W]hen the government makes such a showing, it is a powerful offset to the government's responsibility for excessive delay." *Id.*

does not, however, support her claim with references to the record on appeal and we have been unable to find any such assertions of the right, other than her motion.

■ This case presents us with the task of balancing all those factors—separately for each appellant—to determine the merits of their constitutional claims. We do not consider that appellants were denied their rights to a speedy trial. The length of the delay here was the most significant factor in appellants' favor—particularly for Davis rather than Glass, since he was not responsible for any of the continuances. The reasons for the delay also weigh in their favor—again with the exception of the continuance for Ms. Glass' hospitalization due to pregnancy. On the other hand, the factors which tip the scales here are the delay of appellants in asserting their right—a little over twelve months [10]—and the absence of any substantial prejudice to either appellant.

## II.

At the suppression hearing, trial counsel for appellant Glass argued that the arrest occurred at the time appellants were removed from the scene of the traffic stop back to the scene of the crime for a show-up identification. Counsel argued that there was no probable cause to arrest at that time and consequently all fruits of that illegal arrest—including physical evidence seized from the car, some inculpatory statements she made, and the identification by Monroe—should be suppressed.[11] The trial court found probable cause existed and therefore denied the motion.[12] Both appellants now appeal that ruling. They argue that even if the arrest were valid, the search was still illegal because the police did not obtain a warrant. The prosecution argues that the arrests did not take place until after Monroe identified appellant Glass, her brother, and Durant. It argues that the warrantless search following their arrest was valid under *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) and its progeny.

At the suppression hearing, Officer White testified that he first saw the car in which appellants were driving sometime between 4:40 and 4:50 a. m. near Gate One of St. Elizabeths Hospital, on Martin Luther King Avenue, Southeast. Seeing the car run a red light, he and his partner proceeded to stop the car about two blocks from there, in the 2600 block of Dunbar Road.[13] About two minutes after the car was stopped, and while his partner spoke with the car's driver (appellant Davis), Officer White heard a radio lookout concerning a robbery which had occurred a few minutes earlier at a tourist home about five to ten blocks away. Officer White testified that the lookout had provided a description of the suspects as being one white female, one white male, and one black male. The report also disclosed the "approximate height and weight of each subject," according to White. Although the precise details of the lookout were not disclosed at the hearing, a transcript of the lookout was used to refresh Officer White's recollection as to the details of the broadcast description of the suspects and was also read by the trial court. The trial court indicated it enumerated "the height, weight, color, facial hair, length of hair, stringy hair, and all that sort of stuff."[14] Two discrepancies were apparent

10. Furthermore, this case proceeded to trial within one month of appellant Glass' assertion of her speedy trial right.

11. Appellant Davis did not join this motion to suppress. In light of our disposition of this issue, however, that failure has resulted in no prejudice to him.

12. The trial court did not specify at what point probable cause existed.

13. No one seeks to question the validity of this traffic stop.

14. We requested that this transcript be provided to us as a supplementary record. The general broadcast provided the following details: "robbery hold-up, gun which occurred at 303 Parkland Pl., S.E. about 0445 hours today's date, # 1 is a negro male, dark complexion, about 5-10 to 6'—170-180 pounds, had on a dark outfit, # 2 is a white male, 5-4 to 5-6—140-160 pounds, had brown curly hair, subject # 2 was wearing rubber gloves, # 3 subject was a white female, long stringy hair, about 5-4 . . . also for # 1 he was armed with a dark handgun, they were last seen out the front door and unknown direction from there. Obtained about six dollars in bills."

between the broadcast description of the suspects and the occupants of the stopped car: (1) there were four people in the car, not three; and (2) the lookout described the white male as being five feet four inches to five feet six inches in height, but, under cross-examination, Officer White admitted that the white male in the car could have been close to six feet tall.

Officer White called for a back-up unit of officers and upon arrival they took appellants and the other two suspects back to the scene of the crime for a show-up identification. Officer Bernard Taylor, one of the policemen who transported appellants back to the crime scene, testified that when he first arrived at the location of the stopped car, he advised appellant Glass of her *Miranda* rights,[15] leaving out the part about being under arrest.[16] He further testified that although she was not under arrest at that time—since she had not yet been identified—she was not free to leave his vehicle at any time. As soon as she and the other two suspects—but not appellant Davis—were identified at the show-up, all four were arrested.

■■■ We do not regard the question of when the arrest occurred as controlling our decision,[17] since "[e]ven if the formal arrest was not made until after the search, the search will be upheld so long as there is probable cause for an arrest before the search is begun." *(Barry) Bailey v. United States,* 128 U.S.App.D.C. 354, 357, 389 F.2d 305, 308 (1967), *citing United States v. Gorman,* 355 F.2d 151, 159–60 (2d Cir. 1965), *cert. denied,* 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966). Here, the search occurred at some point after appellants were removed from the car and taken back to the scene of the crime.[18] For reasons which follow, we have concluded that probable cause to arrest existed prior to the search.

■■■ We think the police had probable cause to arrest at the time the occupants of the car were taken back to the scene of the crime. *(Barry) Bailey v. United States, supra; Brown v. United States,* 125 U.S.App. D.C. 43, 365 F.2d 976 (1966). *See Clemm v. United States,* D.C.App., 260 A.2d 687 (1970); *Heard v. United States,* D.C.App., 197 A.2d 850 (1964); *Daniels v. United States, supra.* Compare *United States v. Short,* 187 U.S.App.D.C. 142, 570 F.2d 1051 (1978). During the initial traffic stop, the police were apprised of the following facts: (1) an armed robbery had occurred only a few minutes before they stopped this car; (2) the crime had occurred within five or ten blocks from where they saw the car run the red light; (3) the car had been heading away from the direction of the crime; (4) the car ran a red light;[19] and (5) the crime

15. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

16. After she was identified by Monroe at the crime scene confrontation, he read her the full *Miranda* warning.

17. It appears probable, however, that the arrest occurred at the time the suspects were all ordered from their auto and placed in the police car. *See Crawford v. United States,* D.C.App., 369 A.2d 595, 598 (1977). *But see Randall v. United States,* D.C.App., 353 A.2d 12 (1976); *Bates v. United States,* D.C.App., 327 A.2d 542 (1974).

18. The officer who conducted the search of the car testified that he was certain of the robbery's occurrence, but was not aware of the identifications at the time he conducted the search. The officer who conducts a search is not required to have sufficient firsthand knowledge to constitute probable cause, so long as the officer "initiating the chain of communica-tion either had firsthand knowledge or received his information from some person . . . who it seems reasonable to believe is telling the truth." *Daniels v. United States,* 129 U.S.App. D.C. 250, 252, 393 F.2d 359, 361 (1968); *accord Clarke v. United States,* D.C.App., 256 A.2d 782, 785 (1969). Because we have concluded, *infra,* that probable cause to arrest existed at the time appellants were taken from the car back to the scene of the crime, and because the officers who stopped appellants' vehicle and who had probable cause to arrest were still with the vehicle when the other officers conducted the search, the inference is inescapable that the required link in the chain of communi-cation is satisfied. The warrantless search for evidence here falls within the exception for searches of moving or moveable vehicles. *Chambers v. Maroney, supra.*

19. From this not unusual fact, when coupled with all the other circumstances, the police could have reasonably inferred the car's occu-pants had been hastily fleeing a crime.

had been committed by one white male, one white female, and one black male—with rather particularized descriptions of each which apparently matched the occupants of the car in all respects except for the height of the white male. This last factor is entitled to special weight, since at 4:45 a. m., there are not likely to be very many groups of persons who would match so closely the detailed descriptions in the lookout. *Compare United States v. Short, supra.*

We do not think it significant that the stopped car contained four persons instead of just three, as mentioned in the lookout. As the court stated in *(Barry) Bailey v. United States, supra* at 358, 389 F.2d at 309 "[t]he police could reasonably suppose that a fourth man, serving as a lookout, had waited in the car while the other three perpetrated the robbery itself. . . ." Nor, considering all of the other matching details of the description, do we think the discrepancy between the apparent height of the white male in the car and the height stated in the lookout is fatal to a finding of probable cause here. A crime victim's observation may be faulty in some respects due to his excitement or poor visibility, but so long as there is other sufficient, particularized information to constitute probable cause, such a mistake should not be considered fatal. *Carey v. United States,* D.C. App., 377 A.2d 40, 47 (1977); *Cox v. United States,* D.C.App., 256 A.2d 917, 919 (1969); *(Barry) Bailey v. United States, supra* at 358, 389 F.2d at 309; *Brown v. United States, supra* at 45, 365 F.2d at 978.[20]

### III.

Appellant Glass argued at the pretrial suppression hearing not only that any identification testimony should be suppressed at trial as being the fruit of an illegal arrest,

but also because any such evidence would be the result of an impermissibly suggestive show-up. She now contends the denial of that motion violated due process and deprived her of the right to assistance of counsel.[21] Her contention concerning the illegal arrest has been decided against her. We are left with the following contention: since the show-up took place without the presence of a defense attorney and while she was subject to the "inherently coercive and intimidating presence" of the arresting officers, the confrontation was per se suggestive, resulting in violations of her due process rights and her right to the assistance of counsel. Brief for Appellant Glass at 19–20. We disagree.

Complainant Monroe testified that the police brought back the suspects to the tourist home at about 5 or 5:15 a. m.—*i. e.,* about thirty to forty-five minutes after the armed robbery occurred. He was asked if he could identify any of the four suspects who were standing on the sidewalk outside. Although the suspects were in police custody, there is no suggestion that they were handcuffed or otherwise presented in a particularly suggestive manner. Doubtless, a degree of suggestiveness inheres in any pretrial confrontation between a witness and suspects in the custody of the police. As a general rule, however, "it is not improper for the police immediately to return a freshly apprehended suspect to the scene of the crime for identification by one who has seen the culprit minutes before." *Russell v. United States,* 133 U.S.App.D.C. 77, 81, 408 F.2d 1280, 1284, *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969). There is no right to counsel at such show-ups, conducted shortly after the offense. *Id.* The critical issue becomes whether this confrontation was shortly after the offense.

20. Greater discrepancies between the description in the police lookout and the man arrested were present in *Brown v. United States, supra,* where the court affirmed the denial of a suppression motion on facts similar to these.

21. Appellant Davis notes in his brief that he incorporates this argument on appeal, without further explanation. He was never identified pretrial or at trial by Monroe as being one of the three persons who robbed him—only as being one of the four suspects at the show-up. Consequently, there appears to be nothing prejudicial to object to—especially since he admitted being in the car with the other three. Regardless, we have found no errors relating to the admissibility of any of the identification evidence.

*Jones v. United States*, D.C.App., 277 A.2d 95, 98 (1971). In *Russell* the show-up was about thirty minutes after the crime and in *Jones v. United States, supra,* the show-up was about sixty minutes after the crime. Here, the time period was between thirty and forty-five minutes. Consequently, we conclude that neither appellant's constitutional right to counsel was violated. *Washington v. United States*, D.C.App., 334 A.2d 185 (1975).

*Russell* also reaffirmed prior holdings that "absent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations . . . ." *Russell, supra* at 81, 408 F.2d at 1284 (footnote omitted). This record does not reveal any elements of undue suggestivity or unfairness. The Supreme Court recently emphasized that regardless of suggestivity "reliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2245, 53 L.Ed.2d 140 (1977). There is little doubt as to the reliability of Monroe's identification of appellant Glass. He saw her for two or three minutes in a well-lighted room. He appears to have described her to the police. He was certain in his identification of her at the show-up, which occurred less than forty-five minutes after the offense had been committed. Consequently, we hold that no due process rights were violated by the use of any of the identification evidence at trial.

### IV.

Appellants argue that the trial court erred in denying their motions for judgment of acquittal, since the evidence only established their presence at the scene of the crime and mere presence does not support an inference of aiding and abetting a robbery. Because the evidence established much more than mere presence at the scene, we reject their contentions.

We start from the premise that a person "who knowingly participates in the commission of a criminal act by assisting the principal is equally liable." *Byrd v. United States*, D.C.App., 364 A.2d 1215, 1219 (1976), *citing* D.C.Code 1973, § 22–105 and *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949). To establish aiding and abetting, the following elements must be shown: (1) someone has committed an offense; (2) the accused either participated or assisted in its commission; and (3) the accused did so with guilty knowledge. *Byrd v. United States, supra* at 1219. Although presence at the scene of the crime, without more, does not satisfy all of those elements and therefore is an insufficient basis to permit a conclusion of criminal complicity, *Hicks v. United States*, 150 U.S. 442, 447–48, 14 S.Ct. 144, 37 L.Ed. 1137 (1893); *Creek v. United States*, D.C.App., 324 A.2d 688, 689 (1974), presence which "designedly encourages the perpetrator, facilitates the unlawful deed . . . or . . . stimulates others to render assistance to the criminal act" will support a conviction. *Creek v. United States, supra* at 689, *quoting (John) Bailey v. United States*, 135 U.S.App.D.C. 95, 98–99, 416 F.2d 1110, 1113–14 (1969) (footnotes omitted).

So long as the prosecution introduces sufficient evidence to satisfy the trial court that a reasonable person could find guilt beyond a reasonable doubt, the trial court's decision to submit the case to the jury will be upheld. *Childress v. United States*, D.C.App., 381 A.2d 614, 619 (1977); *Curley v. United States*, 81 U.S.App.D.C. 389, 392–93, 160 F.2d 229, 232–33, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). In reviewing the trial court's denial of appellants' motions for judgments of acquittal, we must view the evidence in the light most favorable to the prosecution. *See Calhoun v. United States*, D.C.App., 369 A.2d 605, 606–07 (1977); *Crawford v. United States*, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967).

The evidence adduced at trial established that appellant Glass accompanied Manuel Durant to the door of the tourist home knowing there was going to be a robbery. Once at the door Danny Monroe let them in and the armed robbery ensued soon thereafter. The court in denying the

motion for judgment of acquittal noted that "if she went up to the door with the purpose of getting the door open, because a man and woman would be registering, that's assisting the aiding and abetting." The only explanation offered by appellant for why she went to the tourist home door as part of the robbery scheme was that she had been coerced by appellant Davis. This defense of duress was apparently rejected by the jury. The inference that she had either "designedly encouraged" or "facilitated" the robbery by posing as a couple for a ruse to gain entry is clearly warranted. *See* and *compare Creek v. United States, supra; In re T.J.W.,* D.C.App., 294 A.2d 174 (1972), *with Quarles v. United States,* D.C. App., 308 A.2d 773 (1973); *(John) Bailey v. United States, supra.*

Appellant Davis drove the car to and away from the tourist home. Both Danny and Brenda Glass testified that Davis had initiated the robbery plan, knew all about it, and had provided Manuel Durant with the gun to use in the robbery. His presence at the crime as driver of the car, coupled with the testimony that his involvement was part of "a common plan and concerted action," *Childress v. United States, supra* at 619, was sufficient to support submission of the issue of his guilt or innocence to the jury. *See* and *compare Creek v. United States, supra; In re T.J.W., supra; (Barry) Bailey v. United States, supra, with Quarles v. United States, supra; (John) Bailey v. United States, supra; Goodwin v. United States,* 121 U.S.App.D.C. 9, 347 F.2d 793, *cert. denied,* 382 U.S. 920, 86 S.Ct. 298, 15 L.Ed.2d 234 (1965).

## V.

During cross-examination by counsel for appellant Glass, appellant Davis was asked if he were the same Louis Davis convicted for robbery in 1952 and in 1963. He acknowledged that he was. He now complains of that impeachment for two principal reasons: (1) that the use of the prior convictions came as a surprise to his attorney; and (2) that their use violated the local statute governing impeachment, D.C. Code 1973, § 14–305(b)(2).[22]

■ Appellant admits that on the day of trial the prosecution filed with the court and mailed to appellant's counsel a form containing information as to two or more previous felony convictions—thereby providing the court with the option, upon appellant's conviction, to subject him to increased punishment pursuant to D.C.Code 1973, § 22–104a. He argues, however, that although he was warned of the potential use of the prior convictions for punishment purposes, the government was still obligated to warn him specifically that they might also be used for impeachment. Davis' counsel was aware of Glass' counsel's intention to impeach Davis from a bench conference concerning the admissibility and use of those convictions. The government cannot be expected to anticipate a codefendant's use of them. Under such circumstances, this contention has no merit.

■ Appellant also argues that the convictions were too old and consequently inadmissible under D.C.Code 1973, § 14–305(b)(2)(B).[23] At the bench conference to

---

**22.** He also argues that the exclusive method of proof of prior convictions is through the introduction of a certificate under seal of the clerk of the court, pursuant to D.C.Code 1973, § 14–305(c). There arose no need to prove the existence of the prior convictions here, since appellant Davis himself admitted their existence in open court.

**23.** He further contends the court erred in not conducting a hearing to determine their admissibility. Presumably, appellant is referring to the *Luck* hearing, *Luck v. United States,* 121 U.S.App.D.C. 151, 348 F.2d 763 (1965), held in determining admissibility under the prior law,

D.C.Code 1967, § 14–305. Under the prior law, the court was authorized to exercise some discretion in admitting prior convictions, and consequently a hearing was often necessary in the interests of justice. Now, § 14–305(b) provides that prior convictions "*shall* be admitted" (emphasis added) under specified circumstances and thus no longer allows the court to exercise any discretion. *Davis v. United States,* D.C. App., 313 A.2d 884, 885 (1974). A hearing does not appear warranted now under the *Luck* rationale. Only a very limited inquiry is necessary to determine whether the prior convictions are admissible or inadmissible under the provision's mandatory terms. In the present case,

determine the admissibility of the prior convictions, the prosecutor disclosed that appellant was convicted of robbery in 1952, receiving a sentence of three to fifteen years, and convicted of robbery in 1963, receiving a sentence of five to fifteen years. The court ruled that under his interpretation of the applicable provision, D.C.Code 1973, § 14–305(b)(2)(B), both convictions were admissible. We agree.

The portions of the provision that are pertinent to our conclusion are the following:

[(b)(1)] [E]vidence that the witness has been convicted of a criminal offense shall be admitted . . . but only if the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he was convicted . . . ..

[(b)(2)(B)] [N]o evidence of *any* conviction of a witness is admissible under this section if a period of more than ten years has elapsed since the *later of* (i) the date of the release of the witness from confinement imposed for his *most recent* conviction of any criminal offense, *or* (ii) *the expiration of the period of his* parole, probation, or *sentence . . . imposed with respect to his most recent* conviction of any criminal offense.

D.C.Code 1973, § 14–305(b)(1), (b)(2)(B) (emphasis added). Under this provision, clearly appellant's 1963 conviction is admissible. Even assuming, under a generous construction of the statute for appellant, that 1968 —the date his minimum sentence expired— is the appropriate time from which to measure the period of ten years, then this conviction would be admissible for impeachment up until some time in 1978.[24] The trial here

occurred in 1976—within the permissible period. As a consequence of the 1963 conviction being admissible, we think the language of the statute also permits the introduction of the 1952 conviction. *United States v. Morgan,* 155 U.S.App.D.C. 172, 476 F.2d 928 (1973). In that case, the court construed the plain language of this same provision to permit the use of a conviction nearly fifteen years old for impeachment purposes due to the existence of another conviction within ten years of trial. The language of the statute persuades us that the 1952 conviction was admissible here.[25] *United States v. Morgan, supra* at 174, 476 F.2d at 930.

## VI.

Appellant Davis' final contentions relate to his second motion for a new trial. He requests us to reverse his "conviction on the grounds of ineffective representation of counsel," and, alternatively, to remand this case because the "trial court erred in failing to hear Defendant's second Motion for a New Trial."

On August 19, 1976 Davis' first motion for a new trial—on the grounds of newly discovered evidence—was heard and denied. At this hearing appellant had attempted to show that the newly discovered testimony of several witnesses demonstrated that he had been "framed" by Brenda and Danny Glass. Davis presented two witnesses at the hearing, one of whom testified to that effect—that both Brenda and Danny had told him Davis was innocent, but that they were trying to place all the responsibility on him. The other witness corroborated the fact that the first witness had told Davis

---

the court held a bench conference to determine the existence, type and date of the convictions and the sentences imposed. There is no contention that any material facts were mistaken or omitted in this limited inquiry. Consequently, we find this contention without merit.

**24.** The exact date would depend upon the exact date of expiration of the period for which he was sentenced.

**25.** While on the subject of impeachment, appellant Glass complains that the prosecution

impeached one of its own witnesses, Danny Glass, by making the following statement during closing argument: "Danny Glass is trying to clear his sister. He certainly didn't do a very good job of it, did he?" She argues that the prosecution never laid a proper foundation for such a comment, by either claiming surprise or declaring him a hostile witness, pursuant to D.C.Code 1973, § 14–102. Even if considered excessive, these comments do not rise to a prejudicial level.

this story, but had no personal knowledge of the Glasses or of their having made such statements. Davis also took the stand himself and stressed that he knew about four other prisoners, among others, who would testify to the same effect and that also he had access to a tape of a conversation between his wife and Brenda Glass, in which the latter purportedly stated Davis had nothing to do with the offense, but that she was going to send him to jail if it was the last thing she did. The trial court, as appellant concedes, "leaned over backwards to accommodate Mr. Davis." Davis, however, refused the court's invitation to secure the presence of any and all additional witnesses and to secure the alleged tape. Despite the court's advice to Davis that more testimony would be preferable and that if Davis refused this offer, he would not be heard to argue later that more testimony would have made a difference, appellant insisted on an immediate ruling and received it. The court found the testimony presented to be merely cumulative and impeaching and consequently did not warrant granting a new trial under the applicable criteria set forth in *Thompson v. United States,* 88 U.S.App. D.C. 235, 188 F.2d 652 (1951).

After noting an appeal, and receiving newly appointed appellate counsel, Davis filed a second motion for a new trial. This, too, was based on the grounds of newly discovered evidence as well as ineffective assistance of counsel. What he claimed to be newly discovered evidence was an affidavit of Manuel Durant—one of his original codefendants—which, according to the trial court in its Memorandum Order, "purports to confess to the crime to which he had already entered an *Alford* plea and exculpate the defendant, Louis Davis."[26] This affidavit apparently discussed the alleged duplicity of Brenda and Danny Glass.[27]

The motion also alleged several instances of ineffective assistance of counsel, discussed *infra,* Davis also filed a motion to set this matter down for a hearing. Both motions were denied by the trial court in a written order issued June 28, 1977.

The first question we address is whether the court erred in denying appellant's motion to hold a hearing on his second motion for a new trial. The trial court treated the two grounds for a new trial differently. The ground of newly discovered evidence was considered as made pursuant to Super. Ct.Cr.R. 33. The ground of ineffective assistance of counsel was treated as a motion for appropriate relief under D.C.Code 1973, § 23–110.[28]

Under D.C.Code 1973, § 23–110(c), a hearing is required "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief". See *Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Session v. United States,* D.C.App., 381 A.2d 1, 2 (1977). We have recently had a few occasions to consider this type of issue, *Gibson v. United States,* D.C.App., 388 A.2d 1214 (1978); *Johnson v. United States,* D.C.App., 385 A.2d 742 (1978); *Session v. United States, supra.* In *Gibson, supra* at 1216, we noted that "because § 23–110 is a remedy of virtually last resort, any question whether a hearing is appropriate should be resolved in the affirmative." As we said in *Session, supra* at 2, "[t]his is not to say that a motion for new trial alleging ineffective assistance of counsel automatically requires a hearing." We set forth fully in *Gibson* the situations when a hearing would be inappropriate:

"[I]f it appears that the motion does not state a claim, which if established would require the vacation or alteration of the

26. Memorandum Order at 1.

27. *Id.* at 39.

28. The trial court, on the basis of *Williams v. United States,* D.C.App., 374 A.2d 885, 888–89 (1977), considered that an allegation of ineffective assistance of counsel is not newly discovered under Super.Ct.Cr.R. 33. We did not ex-

pressly so hold in *Williams,* but we do not reach that issue since the parties here appear to agree "that the relevant criteria for the determination upon the necessity of a hearing are contained in D.C.Code 1973, § 23–110." *Johnson v. United States,* D.C.App., 385 A.2d 742, 743 (1978); *see* Supplemental Briefs for Appellant and Appellee.

sentences, no hearing" is required. Moreover, the trial court is not required to conduct a hearing on a Section 23–110 motion if the "exact nature of . . . [the] asserted ineffectiveness [of counsel] was not explained in the motion." Neither general and vague allegations, nor conclusory claims "without facial validity" will justify a hearing under the statute.

\* \* \* \* \* \*

Section 23–110 should not produce mechanical jurisprudence triggered merely by an artful allegation of facts *dehors* the record on appeal. Regardless of the nature of the allegations, the specifications of the motion (1) must be sufficient to indicate an absence of a fair trial in the real sense of that term, (2) must *not* be couched in conclusory terms with essentially no factual foundation or (3) must *not* be patently frivolous on their face, even if true.

*Gibson, supra* at 1216–17 (citations and footnote omitted). In light of these standards, we now consider the allegations relating to ineffective assistance of counsel which appellant presented to the trial court.

In that motion Davis alleges the following defects in his trial counsel's performance—the failure to: (1) file any pretrial motions; (2) ensure the presence at trial of witnesses whom Davis had requested his attorney to subpoena; (3) request a voir dire of the jury concerning an incident which occurred during trial; (4) object to the testimony of Nurse Gregory about the presence of bruises on Brenda Glass; (5) object to questioning about Davis' 1963 conviction or to move for a mistrial thereafter; (6) file post-trial motions; and (7) produce a tape recording and four other witnesses he wanted at the hearing on the motion for a

new trial.[29] All of these allegations relate solely to facts already in the record and only require the court to apply the correct legal standard to reach his conclusion as to the merits of Davis' claim. We agree with the trial court that the facts of record conclusively show that appellant is entitled to no relief. Consequently, we uphold its decision not to conduct a hearing on this claim. *Compare Gibson, supra; Johnson, supra; Session, supra.*

The trial court stated the applicable legal standard by which to measure Davis' claim. To conclude that there has been a constitutional deprivation of the right to counsel due to ineffective assistance of counsel, we must find that "there has been gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense . . . ." *Bruce v. United States*, 126 U.S.App.D.C. 336, 339–40, 379 F.2d 113, 116–17 (1967); *accord, Williams v. United States*, D.C.App., 374 A.2d 885, 889 (1977); *Angarano v. United States*, D.C.App., 312 A.2d 295, 298 n. 5 (1973). The trial court concluded specifically that "[e]xamined in the context of the proceedings in their entirety, this Court finds that the omissions selectively garnered from the record and asserted by the defendant do not rise to the level of ineffectiveness required under *Bruce* to overturn the defendant's conviction."[30] Despite this holding, appellant contends that viewed cumulatively his trial counsel's omissions deprived him of his Sixth Amendment right to the effective assistance of counsel, citing *United States v. Hammond*, 138 U.S.App. D.C. 166, 170, 425 F.2d 597, 601 (1970).

Davis defended himself by contending that his only involvement in the offense was the circumstance of his being the driver of the car. He testified at trial that when

---

**29.** On appeal, Davis notes three other examples of his trial counsel's asserted ineffectiveness. These are the failure to: (1) provide to appellate counsel any information concerning witnesses for the defense or prosecution; (2) join his co-defendant's speedy trial or suppression motions; and (3) cross-examine any police officers at the suppression hearing and only Officer White at trial. We do not consider these

claims in our evaluation of the court's ruling with respect to appellant's request for a new trial based on the claim of ineffective assistance of counsel or for a hearing on that motion because none of these three assertions were before the trial court.

**30.** Memorandum Order at 3.

he stopped the automobile in the vicinity of the tourist home, he left to telephone his uncle from a nearby telephone booth.[31] He testified that when he left the car and when he returned to it, the others were in it. He stated that he did not even know an offense had occurred until he was arrested and taken back to the tourist home. His theory of defense, however, probably was most critically damaged by: (1) his presence in the car as the driver to and from the robbery; and (2) the testimony of Brenda and Danny Glass—to the effect that Davis had initiated the plan and given the gun to Durant. Appellant claims this testimony was fabricated for several unspecified reasons and because of Brenda's desire to obtain custody of their daughter in order to receive welfare payments. This theory of defense was elicited from Davis by his trial counsel, as well as being commented upon in his counsel's closing argument, and was alluded to in connection with his trial counsel's cross-examination of Brenda and Danny Glass.[32]

Here, as in *Woody v. United States*, D.C. App., 369 A.2d 592, 594 (1977),

appellant . . . bases his claim of inadequate representation on a variety of tactical decisions and omissions by trial counsel which cannot be considered to have resulted in a constitutional infirmity. A reading of the record indicates that these omissions, either separately or in the aggregate, did not blot out the essence of a substantial defense. [Footnote omitted.]

The only substantial defense ever alleged by appellant was his lack of knowledge of the offense. His trial counsel placed the essence of this defense before the jury in a reasonably effective manner. Consequently, we conclude the trial court was correct in denying appellant's motion for a new trial pursuant to D.C.Code 1973, § 23–110, based upon a claim of ineffective assistance of counsel. *See Woody v. United States, supra; White v. United States,* D.C.App., 358 A.2d 645, 647 (1976).

■ Appellant Davis, however, also attacks the trial court's denial of his motion for a new trial based on the existence of newly discovered evidence—Manuel Durant's affidavit exculpating Davis.[33] The trial court specifically found that this affidavit did not qualify as newly discovered evidence for "at least" two reasons.

First, it cannot be argued that the testimony of Mr. Durant was previously unavailable to the defendant had he exercised due diligence. In fact, the defendant had two opportunities to produce Mr. Durant. The first opportunity was at trial on March 12–16, 1976. At that time, Mr. Durant was in the custody of the Attorney General and could readily have been located through the Bureau of Prisons. The second opportunity came at the defendant's hearing on his first Motion for New Trial. At that time, the Court offered to subpoena any and all witnesses and evidence not then available for use or testimony at a further hearing. The defendant expressly waived the opportunity to produce such evidence and abandoned any claim that the Court should have heard from the missing witnesses. Finally, it is this Court's view that the belated confession of Mr. Durant, who has already pled guilty to Armed Robbery in connection with this case and has nothing to lose by offering such testimony, is not

---

31. His uncle testified he had received this telephone call on that night and at that approximate time.

32. For example, appellant's trial counsel asked Danny Glass, "isn't it true that that [the robbery] was a spur of the moment decision that you three made when Mr. Davis got out of the car and made a phone call to his uncle?" Trial counsel also sought to impeach Danny Glass by asking, among other questions, whether he was just trying to protect his sister and whether he expected to have his sentence mitigated for his

testimony against Louis Davis. Appellant's trial counsel also impeached Brenda Glass' credibility with several inconsistencies in her story and asked questions which directly touched upon Davis' theory of defense, e. g., that he went to make a telephone call.

33. This affidavit is not part of the record on appeal, and so we rely on the statements of counsel for both parties as to its essential theme.

of such a nature as would probably produce an acquittal for Mr. Davis at a new trial. The record reveals ample credible evidence to support the conviction of the defendant, even in the face of testimony from Mr. Durant consistent with what is stated in the submitted affidavit. [Memorandum Order at 4–5.]

Thus, the court found that two of the five factors set forth in *Thompson v. United States, supra* at 236, 188 F.2d at 653, were not satisfied: (1) appellant failed to show due diligence in attempting to procure the newly discovered evidence; and (2) the evidence was not "of such nature that in a new trial it would probably produce an acquittal." *Id.*[34] We may only reverse the trial court's ruling on this issue for an abuse of discretion, and there was no such abuse here.

*Affirmed.*

KELLY, Associate Judge, concurring:

Since we have no transcript of the proceedings of January 16, 1976, it is impossible to assess the reasons given, if any, for dismissing the first indictment without prejudice. We do not know whether speedy trial concerns were raised at that time. The result of this action is clear, however, *i. e.,* to grant the unprepared government its continuance under the guise of a dismissal without prejudice, with the sure knowledge that the government could, and likely would, seek an immediate reindictment. This procedure was used by the trial judge in *Branch v. United States,* D.C.App., 372 A.2d 998 (1977). It is one which clearly concerned the second trial judge in this case and met with his strong disapproval. Nevertheless, lacking further information, I agree with the result reached in disposing of the speedy trial issue in this case.

I join in the opinion as to the other issues raised.

NEBEKER, Associate Judge, concurring:

I concur in the opinion of the court and in the conclusion that appellants' Sixth Amendment right to speedy trial was not denied. As my concurring opinion in *Bethea v. United States,* D.C.App., 395 A.2d 787 (No. 11934, decided this date) reveals, I question the role which this court plays in the decision of speedy trial issues. We continue to say that the government has a burden to show no prejudice to the accused. That is, to my way of thinking, a virtual impossibility at the trial level, to say nothing of an initial burden in this court. While pretrial incarceration and reasons therefor are easily ascertained from the record on appeal, we have no way of knowing on most records whether the accused experienced sufficient anxiety and concern because of the pending charges and delay to warrant a finding of prejudice. Likewise, if impairment of defense is a factor, we are ill-equipt to decide the factual existence of that type of prejudice.

In similar context, it is also regrettable that our opinions, including this one, have continually used such words as "prima facie merit" in assessing threshold validity of a speedy trial claim, "strong evidentiary weight" respecting timely assertion of the right, "proof" as to a showing of denial of a speedy trial, and requiring "the government to show no prejudice to the accused." These terms are appropriate if we review trial court proceedings where such evidentiary terms have meaning. Those terms have no place at the appellate level when specific facts have not been determined at the trial level.

Here, as in *Bethea,* the only action by the trial court upon assertion of a speedy trial right was a perfunctory denial before trial. No further trial court procedures were had on the issue and we again undertake to treat the claim firsthand through our usual recitation and consideration of four *Barker v. Wingo* * inquiries.

---

**34.** The other three requirements which must be satisfied in order to grant a new trial are: (1) the evidence must be discovered after trial; (2) it must not be "merely cumulative or impeach- ing"; and (3) it must be material to the issues of the case. *Id.*

* *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

I find no basis on this record to grant the extraordinary and costly relief of dismissal for failure to afford a speedy trial. Consistent with my concurrence in *Bethea*, I would leave all questions respecting reasons for delay, timeliness and sincerity of assertion of the right, and prejudice to proceedings in the trial court. I would also require the accused to offer a basis in relevant facts (*Barker v. Wingo, supra*) for his motion to dismiss. As in most speedy trial cases in this court, the record contains a perfunctory claim and denial. More is ordinarily required for dismissal.